YRT SERVICES CORPORATION,
Plaintiff,

v.

The UNITED STATES, Defendant.

No. 93–8C.

United States Court of Federal Claims.

May 6, 1993.

Louis D. Victorino, Los Angeles, CA, with whom was E. Richard Southern, Washington, DC, for plaintiff.

Judith N. Macaluso, Dept. of Justice, Civ. Div., Commercial Litigation Branch with whom were David M. Cohen, Director, Civ. Div., and Stuart M. Gerson, Asst. Atty. Gen., Washington, DC, for defendant.

Daniel Joseph, Washington, DC, with whom were Carl J. Peckinpaugh and Lucy W. Pliskin, for amicus curiae DE North Companies, Inc.

Cyrus E. Phillips, IV, Washington, DC, with whom was William J. O'Brien, II, for amicus curiae Yosemite Park Services, L.P.

## OPINION [1]

HORN, Judge.

### BACKGROUND

The plaintiff, YRT Services Corporation (YRTSC), is a disappointed applicant seek-

1. *NOTE:* Because, in the past, plaintiff has re- quested, and the court has allowed, that certain

ing to enjoin the United States National Park Service (Park Service or NPS), from awarding a concession contract to Delaware North Companies, Inc. (Delaware North).[2] Plaintiff claims that its offer to provide concession services at Yosemite National Park was not considered fairly and fully; that the National Park Service failed to employ the evaluation criteria stated in the Statement of Requirements (SOR); and that plaintiff's offer was the best overall offer, for which plaintiff should have been awarded the contract. In plaintiff's second amended complaint, now before this court, the plaintiff requests a permanent injunction and a declaratory judgment barring the defendant from awarding the contract to any person other than the plaintiff, as well as bid preparation costs and attorneys' fees. In the complaint, as originally filed, the plaintiff requested a preliminary injunction, a permanent injunction and a declaratory judgment barring award of the contract to Delaware North.

In view of plaintiff's request for injunctive relief, this litigation has progressed on an accelerated schedule, made possible, in no small part, by the professional demeanor and competence of the attorneys for both parties. Plaintiff's original complaint was filed on January 11, 1993, and amended twice as new facts arose during the course of discovery. Originally, the plaintiff sought a preliminary injunction, but when, at a status conference, the defendant agreed not to award the concession contract without first notifying the court, plaintiff amended its complaint to request a permanent injunction.[3] At the time the lawsuit was filed, the government had not yet complied with the congressional notification requirement mandated by 36 C.F.R. § 51.4(a) (1992), which provides that after negotiation of a concession contract, for a term of five years or more, or with anticipated revenues in excess of $100,000, the Park Service must forward the proposed contract to the Senate Committee on Energy and Natural Resources and the House Committee on Interior and Insular Affairs for a sixty-day waiting period prior to award. 36 C.F.R. § 51.4(d) (1992).

Discovery was completed in less than six weeks. Voluminous, separate, records were filed by both plaintiff and defendant. Cross-motions for summary judgment were simultaneously filed on February 25, 1993. Reply briefs were simultaneously filed on March 3, 1993. Amicus curiae briefs were submitted by counsel representing Delaware North Companies, Inc., the selectee on the contract, on February 25, 1993, and by counsel representing Yosemite Park Services, L.P., another disappointed applicant, on March 3, 1993. A number of sta-

documents be filed under seal because of proprietary information included in the filings in the above-captioned case, the court initially issued its opinion under seal. Counsel for the parties were advised that they had seven (7) days in which to object to the release of the opinion in its original form. Counsel for the plaintiff, subsequently, requested that certain names of potential investors be redacted from page 47 of the opinion because they should be classified as protected confidential business information. After reviewing plaintiff's request, and after conferring with all parties, the court has accepted plaintiff's suggestion. Weighing plaintiff's claim for privacy against any possible need for disclosure in this case, which has now been completed at the trial court level, leads the court to the conclusion that the plaintiff's request is reasonable. Moreover, defendant's counsel has indicated that the defendant does not object to the redaction, as have counsel for both amici participants. The court has consequently rewritten page forty-seven (47) to amend its earlier opinion, rather than issue two versions of the opinion, one with redactions. [See page 401, *infra*.]

**2.** The plaintiff invokes the court's jurisdiction, which is uncontested, pursuant to 28 U.S.C. § 1491(a)(1) and § 1491(a)(2) (1988), as amended by enactment of the Court of Federal Claims Technical and Improvement Act of 1992, Pub.L. No. 102–572, § 907(b), 106 Stat. 4506.

**3.** At the first status conference on January 13, 1993, this judge inquired of both parties whether either party had any objections to the assignment of this judge to the instant case in light of her previous employment at the United States Department of the Interior from June 1981 to April 1986. As the court pointed out, however, the concession contract at issue was developed, and the selection was made long after she had left the Department of the Interior and was sworn in at the United States Claims Court. Counsel for both parties indicated that neither they, nor their clients, objected to the assignment of the judge to the case at bar.

tus conferences, scheduled by the court, were attended by both parties and either one or both of the amicus participants.[4] Extensive oral argument on the cross-motions for summary judgment was held on March 5, 1993.

### FACTS

YRT Services Corporation, a new company established by the Yosemite Restoration Trust for the purpose of providing concession services in Yosemite National Park, brought this suit to enjoin NPS from awarding a concession services contract to anyone other than the plaintiff.

The Park Service enters into contracts for concession and related services (concession contracts) in national parks such as Yosemite Park which is located in California. Concession contracts are unusual in several respects. Unlike traditional government contracts, the government does not make payments to the contractor. Instead, contractors, known as concessioners, charge for services provided to the public, and, in turn, pay NPS a fee for the right to operate a concession business.[5] Concessioners also provide services to the Park Service. The concession contract proposed in the instant case includes a broad range of services, including lodging, food and gift services. Concessions Policy Act of 1965 (CPA), 16 U.S.C. § 20d (1988). Furthermore, the concession contract is for a fifteen-year term, and, pursuant to the Concessions Policy Act of 1965, 16 U.S.C. § 20d; 36 C.F.R. § 51.3(b) (1992), the concessioner is entitled to a statutory preference for follow-on contracts.

Concessioner fees to be paid to the Park Service under the instant contract include: a franchise fee (currently set at 0%); a rental fee for hotel and other facilities which goes into a Government Improvement Account (GIA); and a Capital Improvement Fund (CIF) fee, which enables the concessioner to undertake projects to improve facilities supporting the concession services. CIF improvement projects are selected by the Superintendent of Yosemite National Park, and must have the written approval of the Director of the Park Service's Western Region. The Franchise Fee, CIF contributions and GIA amounts are reconsidered every four years.

The CPA provides that the Secretary of Interior, consistent with his statutory mission, "to administer national park system areas in accordance with the fundamental purpose of conserving their scenery, wildlife, national and historic objects and providing for their enjoyment in a manner that will leave them unimpaired for the enjoyment of future generations...." shall take actions "to provide and operate facilities and services which he deems desirable for the accommodation of visitors in areas administered by the National Park Service." 16 U.S.C. § 20 (1988). Terms and conditions specified in the statute are intended to promote these goals. Regulations implementing the Concessions Policy Act promote the same goals, and also set standards for selection of concession contractors. 36 C.F.R. § 51 (1992). In pertinent part, the applicable federal regulations provide that:

> the principal factors to be considered in selection of the best proposal shall be (1) the experience and related background of offerors, (2) the offeror's financial capability, and (3) conformance to the terms and conditions of the prospectus in relation to quality of service to the visitor. Secondary factors shall include franchise

---

4. The following ground rules were established regarding amicus curiae participation. First, the court's accelerated schedule could not be impeded under any circumstances. Second, amicus participants would not be permitted to examine any witnesses, nor present any testimonial attachments to any brief submitted. Third, all amici curiae would be served with all filings, and be permitted to submit briefs, including a post-trial brief. Finally, with respect to confidential information, amicus curiae participants

would be bound by the terms of the protective order filed in this case with the court by which proprietary information included in the filings was to be protected from disclosure.

5. The current concessioner, Yosemite Park & Curry Co., under a contract due to expire in September, 1993, collects about $80–85 million each year in gross receipts.

fee offered and other factors as may be specified.

36 C.F.R. § 51.4(b) (1992).

NPS–48, an internal National Park Service handbook, outlines the comparative and individual evaluation methods for concession contracts. In the instant case, it appears that the method employed was that of individual analysis, detailed in NPS–48.

*Individual Analysis*

This approach calls for an analysis of each individual proposal including an evaluation of how each element of the proposal fits and balances with each of the other pieces. This approach can be used effectively in situations where there are very few responses. The final selection is based on the total analysis and judgment of the benefits to the public and impact on the park.

In both instances, a written evaluation report from the panel or evaluator to the executing official should be prepared which summarizes the selection process and provides the medium for the official recommendations. The strengths and weaknesses of each offeror should be summarized and the qualified offers identified along with the recommended offer. The narrative should contain the support for these decisions and the criteria used by the panel. Any qualifications or conditions placed on the recommendations should be clearly discussed so as to properly inform the selecting official.

National Park Service, *CONCESSIONS* GUIDELINE, NPS–48, Chapter 8, Page 4.

For selection of the Yosemite concession contractor, the Park Service used a two-phase solicitation process. In Phase I, NPS issued a Statement of Requirements (SOR), also called a prospectus, to prequalify offerors, and asked applicants to demonstrate the following:

CRITERION 1. THE APPLICANT DEMONSTRATES SUBSTANTIAL COMPETENCE TO MANAGE A COMPLEX SERVICE–ORIENTED BUSINESS ACTIVITY EFFECTIVELY.

CRITERION 2. THE APPLICANT DEMONSTRATES WITH REASON-ABLE ASSURANCE THE ABILITY TO PROVIDE NOT LESS THAN $12 MILLION OF INITIAL EQUITY CAPITAL TO UNDERTAKE THE CONCESSION OPERATION.

Only applicants found qualified in Phase I were eligible to compete in the Phase II SOR, which was issued on July 15, 1992, and closed on November 16, 1992. The best proposal was described as the one most likely to achieve the National Park Service objectives set forth in the Statement of Requirements.

Secondary factors listed in the Phase II SOR included the offeror's proposed Capital Improvement Fund (CIF) contribution, equal opportunity program, and its understanding and commitment to the preservation of the resources of Yosemite National Park. In the Phase II SOR, the primary and secondary factors were divided into sixteen evaluation criteria.

Successful Phase I applicants were told explicitly in the Phase II Statement of Requirements:

Documents submitted under the Phase I process should be regarded as being for that purpose only. They will not be used by the Service in evaluating offers under Phase II. Except for the purpose of addressing the specific criteria of Phase I, the Service neither accepts or rejects any of the proposals or ideas included in submittals under Phase I.

The Park Service indicated in the Phase II SOR that "[t]he offer which NPS determines best meets the overall objectives of the National Park Service will be selected." The Phase II SOR contained the following instructions regarding evaluation of proposals:

\* \* \* \* \* \*

To establish the best proposal, the National Park Service, in narrative form through panel review, will evaluate each proposal against the Evaluation Criteria. The Service will select as the best proposal that proposal which it considers is most likely to effectively achieve the objectives of the Service for concession services and facilities in Yosemite National

Park as reflected in the Statement of Requirements and related documents. In this regard:

1. The services requested, generally as described herein, will be sufficient for the park's needs. Proposals of expansion, deletions, or other similar suggestions not in accordance with Service planning documents or of facilities of a type not requested will not be considered better proposals. Similarly, elements of proposals which offer to provide direct or indirect monetary or other benefits to the Park or government outside of the scope and requirements of the CONTRACT will not be considered as elements of a better proposal.

2. Proposals for financial commitments will be closely reviewed against Balance Sheet and Income Statement projections and the Service's knowledge of the operating costs of this business. Predictable, stable, and well-run businesses consistently providing maximum service to the public in operations and facilities that are the best of their type are most consistent with the National Park Service's objectives of public service. Financial commitments which appear inconsistent with these objectives and/or which do not appear to allow the concessioner a reasonable opportunity for a profit from the operations authorized hereunder based on the capital invested are not acceptable. However, not-for-profit or non-profit proposals will be evaluated as such.

3. The APPLICATION and related materials should reflect the entire proposal being made. The Service may verify information and clarify points as it feels necessary. If supplemental material is desired, the NPS will offer that opportunity to all APPLICANTS.

\* \* \* \* \* \*

5. It is the intention of the National Park Service to select a concessioner from the proposals made without further submittals or presentations. However, the National Park Service reserves the right to request additional information and oral presentations from all APPLICANTS or from the most highly successful APPLICANTS if a 'best proposal' can not be selected from the initial submittals.

\* \* \* \* \* \*

The Phase II SOR also included other pertinent, important conditions, including:

First, as a condition of the award of the contract, the selected applicant had to agree to accept the assignment, without exceptions, of the Agreement and Plan of Merger (merger agreement) between the National Park Foundation (NPF) and the current concessioner, Yosemite Park and Curry Company (YP & CC), as signed on September 20, 1991. The merger agreement was negotiated by the NPF, a non-profit, non-governmental entity, with the current concessioner, YP & CC. The Phase II Statement of Requirements (SOR) for the new concession contract further required that the new concessioner accept an assignment of YP & CC's assets and liabilities from the NPF, which was to act as a facilitator of the transfer. The price and terms of the merger agreement were defined as non-negotiable. Second, offerors were required to submit proposals with the understanding that NPS could not assure that any particular government planning decisions for utilization of Yosemite National Park would be made, could not assure when more decisions would be made, and could not guarantee that plans would not be altered, once made, given the statutory requirement that the park be managed to preserve and protect resources and the responsibility of NPS to continue a process of study with respect to the park activities in general, and the concession facilities in particular. Third, applicants were discouraged from proposing modifications to the contract. Proposals could not be conditioned on the Park Service's acceptance of substantive modifications to the contract.

The Phase II SOR listed sixteen criteria, grouped in five (5) parts, to which offerors

were to respond, and by which the proposals were to be judged. Applicants were instructed to be sure that they addressed each of the criteria provided, and that failure to address any part of the application might cause the proposal to be considered as non-responsive. The Phase II criteria identified were as follows:

## Part I

### Identifying Information

CRITERION 1. THE APPLICANT HAS CLEARLY IDENTIFIED THE ENTITY(S) MAKING THIS PROPOSAL, THE ENTITY(S) THAT CONTROL THE APPLICANT, AND THE ENTITY(S) TO BE INVOLVED IN OPERATING THE BUSINESS AND HAS PROVIDED THE SUPPORTING MATERIALS CALLED FOR.

The types of information required to be submitted under this criterion included names of owners, corporate officers, and members of the Board of Directors, the Articles of Incorporation and By–Laws, and financial statements for the proposer and parent company.

## Part II

### Experienced Related Background

CRITERION 2. THE COMPETENCE OF THE ENTITY, AS REFLECTED IN THE APPLICATION, TO MANAGE THIS BUSINESS ACTIVITY EFFECTIVELY.

and

CRITERION 3. THE COMPETENCE OF THE PRINCIPAL AND OTHER STAFF, AS REFLECTED IN THE APPLICATION, TO OPERATE HOTEL, MOTEL, CABIN, RESTAURANT, CAFETERIA, TOUR and INTERPRETATION, FAST FOOD, SNACK BAR, MERCHANDISE, GROCERY MARKET, GIFT SHOP, SERVICE STATION, TRANSPORTATION, SKIING, PUBLIC SHOWERS, LAUNDRY and RELATED FACILITIES and SERVICES.

Information requested under Criteria two and three included detailed resumes for all partners, sole proprietors and key employees, including on-site managers, the edu-cation and special skills, special training and licenses of each, as well as, the specific role of each such individual manager. The SOR requested specific information on the size of operation, dates, areas of operation, specific duties, number of people supervised, hours worked per week, and other factors that would be helpful to reviewers in establishing a clear understanding. Applicants were instructed not to omit training, education or special qualifications, ratings, or licenses, needed in some special occupations.

## Part III

### Plans for Operation (which encompassed criteria four through eleven)

CRITERION 4. THE EXTENT TO WHICH THE BUSINESS STRUCTURE PROPOSED IS SUFFICIENTLY STAFFED AND IS APPROPRIATELY STRUCTURED TO DELIVER THE SERVICES REQUIRED IN A QUALITY MANNER.

Requested information included an organizational chart showing principal lines of authority, the number of employees in each department, together with their projected functions, and identification of management decision-makers and key employees. Proposed wage levels, estimated hours per work for positions and the proposer's plan for transition from the former contractor were also to be provided.

CRITERION 5. THE EXTENT TO WHICH EMPLOYEE POLICIES ARE WELL–PLANNED AND WILL PROVIDE QUALITY EMPLOYEES.

The SOR requested details regarding policies for hiring, including the offeror's plan for conducting background reviews of job applicants, as well as specifics about policies for training, recreation, housing, and termination. Also, the applicant was required to outline its proposed program(s) to ensure that employees would be hospitable and would exercise courtesy to the public.

CRITERION 6. THE EXTENT TO WHICH THE MAINTENANCE ACTIVITIES PROPOSED ARE SYSTEMATIC AND REFLECT A GOAL OF SUS-

TAINED HIGH QUALITY FACILITIES. THE APPLICANT ACCEPTS THE PROPOSED MAINTENANCE PLAN [furnished by NPS]. AN ELEMENT OF A BETTER OFFER WILL REDUCE NPS RESPONSIBILITY OR COSTS UNDER THE PROPOSED PLAN.

Criterion six asked the applicant to describe its plans to provide proper maintenance of all equipment, rental equipment, furnishings, fixtures, buildings, and grounds. Also, the applicant was asked to describe its approach towards the care of what the government determined to be "reserved property" in the contract, to indicate whether the offeror would accept the proposed maintenance plan, and if the applicant could make changes to the plan, to suggest the changes which would be proposed.

CRITERION 7. THE EXTENT TO WHICH THE OPERATIONS PROPOSED MEET THE SERVICES OBJECTIVES AND REFLECT A GOAL OF SUSTAINED HIGH QUALITY FACILITIES AND SERVICES THAT ARE THE BEST OF THEIR TYPE. THE APPLICANT ACCEPTS THE PROPOSED OPERATING PLAN.

Under this criterion, the applicant was asked to express its concerns or reservations with the terms and conditions of the NPS plans included in the proposed contract (which was provided to applicants and covered the Concession Services Plan and the Housing Plan). Also, the applicant was asked to express any reservations with the operating plan. However, applicants were reminded that proposals of expansion or deletion, not in accordance with NPS planning documents, would not be considered better proposals. Additionally, applicants were asked to provide details on brand names, logos, pricing, internal quality control procedures and any design and construction necessitated under the contract, as well as quality control procedures and employee incentive programs.

CRITERION 8. THE EXTENT TO WHICH SAFETY, SECURITY AND

SANITATION ISSUES ARE IDENTIFIED AND SOLUTIONS PLANNED.

This criterion required the applicant to specify its existing Loss Control Plan, if any, and to describe its plan for managing safety, security, and sanitation.

CRITERION 9. THE QUALITY OF THE APPLICANT'S PROPOSED EQUAL OPPORTUNITY PROGRAM.

The applicant was asked in criterion nine to provide details of its minority participation plan to advance equal opportunity goals and to indicate whether it had previously "participated in a previous permit, contract, or sub-contract subject to the Equal Opportunity Clause contained in Executive Order No. 11246."

CRITERION 10. LIABILITY AND PROPERTY INSURANCE MEETS OR EXCEEDS THE REQUIREMENTS OF THE NATIONAL PARK SERVICE INSURANCE PROGRAM.

Regarding insurance, the SOR asked offerors to describe in detail the property coverage, liability coverage and any other coverage the offeror proposed to carry. The SOR required the winning concessioner to insure the buildings, structures, equipment, furnishings and betterments and merchandise used in the operation. Full replacement value coverage was stated as the preferred insurance approach.

CRITERION 11. IF THE MCA[6] FINANCING IS ACCEPTED BY THE APPLICANT, THE PROPERTY AND LIABILITY INSURANCE MEETS OR EXCEEDS THE REQUIREMENTS OF THE MERGER AGREEMENT.

The Statement of Requirements asked offerors to describe in detail the property insurance coverage, the liability coverage and any other insurance which the applicant intended to carry if selected.

Part IV

*Joining the National Park Service Mission*

CRITERION 12. THE EXTENT TO WHICH THE ENTITY WILL,

---

**6.** MCA is the parent company of YP & CC, Yosemite Park and Curry Company, the existing concessioner.

THROUGH ASPECTS OF IT'S [sic] OPERATION DESCRIBED BELOW, DIRECTLY CARRY OUT PROGRAMS WHICH PRESERVE, PROTECT AND INTERPRET THE RESOURCES OF YOSEMITE NATIONAL PARK.

CRITERION 13. THE EXTENT TO WHICH THE ENTITY REFLECTS AN UNDERSTANDING OF THE NATIONAL PARK SERVICE MISSION AND A CONCESSIONER'S ROLE IN CARRYING OUT THAT MISSION.

Applicants were cautioned in regard to criteria twelve and thirteen: "proposals that offer to provide benefits to the park or government that are outside the terms of the CONTRACT will not be considered a better offer." Applicants were asked to give specifics regarding: the contemplated redirection of the gift and souvenir program; plans for setting standards and training to achieve a consistent level of knowledge and friendly attitudes among all staff about the park; and, the applicant's resource protection program. Moreover, applicants were expected to address the following resource protection issues: solid waste disposal, water and energy conservation, pest management, EPA requirements for underground tanks, air quality, mitigation of human-wildlife interactions, and, the harmonious construction of facilities. The overall goal was to minimize negative impacts on the environment. Offerors were requested to provide their "philosophy on operating within a National Park Service area."

Part V

*Financial Operations and Financing*

CRITERION 14. THE EXTENT TO WHICH THE APPLICANT HAS A WELL-FOUNDED ESTIMATION OF THE LEVEL OF SALES AND EXPENSES THE BUSINESS WILL GENERATE, AND HAS MADE SOUNDLY BASED ESTIMATES SHOWING CASH FLOW AND RETURNS ON THE CAPITAL INVESTED.

CRITERION 15. THE EXTENT TO WHICH THE APPLICANT DEMON-STRATES ADVANTAGEOUS TERMS FOR FINANCING.

CRITERION 16. THE PROPOSAL MAKES THE COMMITMENT TO THE CAPITAL IMPROVEMENT FUND THAT THE NPS CONSIDERS WILL ADVANCE THE IMPLEMENTATION OF THE GOALS OF THE CONCESSION SERVICES PLAN AND THE HOUSING PLAN TO THE GREATEST EXTENT POSSIBLE WHILE BEING CONSISTENT, IN NPS JUDGEMENT, WITH A REASONABLE OPPORTUNITY FOR A PROFIT ON THE CAPITAL INVESTED AND FULFILLMENT OF OTHER OBLIGATIONS OF THE CONCESSIONER.

Applicants were expected to provide detailed estimates of projected revenues and expenses, in formats provided by NPS, for the fifteen (15) years of the contract period, and to show estimated, annual cash flow, utilizing a 4% inflation rate. Additionally, applicants were expected to propose a Capital Improvement Fund (CIF) contribution, expressed as a percentage of gross receipts. For this criterion, the Park Service suggested that less than a 5% CIF proposal would likely be considered insufficient, but that applicants were free to make whatever proposal they felt appropriate.

Regarding initial equity for working capital, the Phase II Statement of Requirements stated:

The APPLICANT will provide a minimum of $12 million as initial equity for working capital. That amount is intended to include the amount reimbursable to NPF [National Park Foundation] as described at page 9 of BUSINESS OPPORTUNITY, *Purchase of Existing Assets and Business.* This must appear on the books of the New Concessioner as equity, not debt. Make sure that these commitments are reflected in the financial information provided. Describe the source of and terms for these funds.

Regarding the source of financing, the Phase II SOR abandoned the "reasonable assurance" standard utilized in Phase I,[7]

---

**7.** The objectives of NPS in Phase I and Phase II were markedly different. In Phase I, NPS set a

and adopted a higher, "compelling evidence" standard:

*Identify the source of any financing needed.* Document the availability of financing with financial statements, financing agreements and letters of intent from lenders. Present compelling evidence of proposers ability to obtain the necessary financing. Be specific. Identify all sources. [Emphasis added.]

In addition, applicants were directed to describe the financial terms of each proposed financing source; to submit sufficient documentation to demonstrate, in a compelling way, the availability and commitment of funds raised from individuals; and to include details of funds raised from other sources. The SOR directed applicants to "[p]rovide also a departmental pro forma for fifteen years in the format provided. The assumptions on which the projections are based must be explained to a degree sufficient for reviewers to judge the validity of the estimates." The SOR also stated that if funds were to be raised from individuals, the applicant was instructed to submit sufficient documentation with its application to demonstrate, in a compelling way, the availability and commitment of such funds.

Applicants were also instructed to describe how the offeror's financing arrangements, taken as a whole, were advantageous to the government:

Describe how your financing arrangements taken as a whole, are advantageous terms for financing that balance the financial interests of the Service in this CONTRACT, the need for a soundly financed company with the least number of financing issues to be negotiated in the future. Paying MCA cash at the closing, financing the purchase price through equity contributions and/or alternative financing arrangements, or an equity investment in excess of the $12

million minimum requirement, could all be aspects of a better offer depending on their overall effect of the park's future.

APPLICANTS should note that, ideally, NPS would prefer to award the CONTRACT to an APPLICANT that does not choose to utilize the MCA financing arrangements due to the complex nature of the security agreement involved. Alternative financing arrangements will be considered as an element of a better offer in circumstances where the overall financing aspects of the proposal are viewed as advantageous to NPS taking into account the terms of the MCA financing package.

The APPLICANT selected by NPS to be awarded the CONTRACT may, subsequently, propose for NPS consideration modifications to its financing arrangements if they are at least as favorable to NPS as those presented in the offer. NPS, however, is not obligated to accept such modifications. Modifications in financial terms approved by NPS, including but not limited to modifications to the MCA financing arrangement, if applicable, will not be considered a material amendment to the terms and conditions of this SOR or the CONTRACT.

Please provide any additional information as to how you would meet the objectives of the above criteria.

The NPS evaluation panel met in San Francisco on December 1–9, 1992. Two weeks were set aside to conduct a detailed evaluation of the proposals and report to the selection panel. The selection panel met in San Francisco on December 10, 1992, and spent one-half day with the evaluation panel and one-half day on internal deliberations. The selection panel met again in Washington, D.C. on December 16, 1992 to present its recommendation to the Deputy Director of NPS.

goal of prequalifying applicants "to have a list of those who would like to take a detailed look at our proposition and who are financially and managerially likely to be able to be competitive." As stated in the SOR: "NPS will select through the Phase I–SOR process those applicants that demonstrate with reasonable assurance that they have the financial and management capability to successfully conduct the concession operations described herein." In Phase II, the government's intention was to select from the offers received that offer "which best meets the overall objectives of the needs of the National Park Service."

Instructions were given to the six evaluation panel members by Stephen G. Crabtree, chairman of the evaluation panel, in a memorandum dated November 13, 1992.[8] The memo stated:

Our schedule is proposed as follows:

1. Read all offers and discuss the evaluation methodology.

2. Discuss offers looking for obvious unsuccessfuls and document that.

3. Divide into subject teams. Each team to review and rank offers for a few Criteria. Document pluses and minuses of each response on each criterion.

4. Assemble the prioritizations with team presentations. Discuss pluses and minuses. As we go along, make a matrix of the results—each offer against all criterion.

5. [Five appears to have been accidently omitted. The original skips from 4 to 6.]

6. Discuss each company on an overall basis and document pluses and minuses.

7. Prioritize the companies and document why.

8. Review the full analysis on Thursday, December 10, 1992, with the Management Team of Stan, Mike, Jack, and Lee. [United States Department of the Interior employees, but the team also included Mr. Calvin Cooper, Acting Assistant Director, Denver Service Center.] We will discuss our prioritized offers in order. This session will be to explain and inform. It is a way of both briefing management and looking for loose ends.

9. Ask the management [selection] team to pick.

10. Finish up any documentation needs. We want to be finished completely by the [sic] December 11, 1992.

Crabtree indicated that the evaluation process could be altered depending on the nature of the offers received. Crabtree also indicated that he would have blank evaluation sheets available for each panel member and that when the evaluation was complete, the panel would produce one summary sheet for each offer reflecting the comments. At the end of the process, Crabtree indicated that a matrix would be produced by the evaluation panel, comparing all offers, as well as a memo to management describing how and why the applications were ranked.

The evaluation panel rated each of the six (6) applicants individually on each of the sixteen criteria detailed in the SOR, and produced a matrix, titled "Yosemite Concession Offer of Summary Ratings," comparing the offers received on all the criteria. Plaintiff YRTSC's proposal was rated successful on all but criteria fifteen and sixteen, on which plaintiff YRTSC's proposal was rated "unsuccessful."[9] For the Phase II SOR Criterion 15, the Park Service required the applicants to provide a minimum of $12 million as initial equity for working capital and to describe the source and terms for these funds. The applicant was directed to present "compelling evidence" of the ability to obtain the necessary financing, utilizing documents such as financial statements, financial agreements and letters of intent from lenders. As indicated, the SOR also specified that the applicant must "[d]escribe how your financing arrangements taken as a whole, are advantageous terms for financing that balance the financial interests of the Service [NPS] in this CONTRACT, the need for a soundly financed company with the least number of financing issues to be negotiated in the future." The evaluation panel gave plaintiff YRTSC an "unsuccessful" rating, based on its failure to present "compelling evidence" of meeting Criterion 15. In its report, the evaluation panel stated:

---

**8.** The memorandum was also directed to Mr. Lars Hanslin, Senior Attorney, Office of the Solicitor, Department of the Interior, and Mr. David M. Dornbusch, President, David M. Dornbusch & Company, Inc., a consultant.

**9.** Throughout the reports and memos prepared by the evaluation panel and the selection panel, the terms "unsuccessful" and "unsatisfactory" appear to have been used somewhat interchangeably.

This proposer states that they raised $7 million of the required $12 million equity contribution as of the submission of the proposal.[10] There is no compelling evidence that the balance is available.[11]

YRTSC also proposed to use the MCA note, to finance $61,575,000, but indicated that if it was awarded the contract, YRTSC could anticipate entering into immediate negotiations with MCA to revise the repayment schedule and to negotiate a discount from the face value in return for payment of the note.[12] In an apparent equivocation regarding whether or not YRTSC possessed the necessary $12 million financing on hand, the applicant stated that "[w]ith this agreement in hand, we are confident that the required funding *will be* secured." [Emphasis added.]

The evaluation panel also rated YRTSC "unsuccessful" on Criterion 16 because YRTSC had conditioned its proposal by stating that any change in operations by NPS introduced by implementing actions under the CSP or Housing Plan will be subject to negotiation. Additionally, the level of contribution to the CIF would also be subject to negotiation. The evaluation panel wrote:

> YRT's 'assumption' that plan implementations and contributions be renegotiated for any change in operations occasioned by implementation of each component of the Concession Services Plan or the Housing Plan is not an acceptable condition.[13]

We conclude that the present value of the proposer's contribution to the CIF would be approximately $65.7 million over the life of the contract. This translates to an average percentage of 6.1% of the present value of gross receipts.[14] Considering only the first four years of the contract (recognizing that NPS will renegotiate the CIF percentage), the proposer's offer was $7.0 million. This

---

10. YRTSC's proposal, however, as is discussed more fully below, showed a total capital investment of $7,035,000 consisting of $7,000,000 in preferred stock and $35,000 in common stock.

11. YRTSC's proposal, part V, page 99, addressed funding:
 > YRT Services Corporation has raised $7.0 million in preferred stock commitments from the investors listed in Part I. Their subscription letters are available for review upon request. We *anticipate* receiving additional commitments of $5.0 million before contractor selection, and full subscription documentation signed by YRTSC investors by the time the contract is signed by YRTSC, following negotiations with the Park Service. [Emphasis added.]

 And, page 97 of YRTSC's proposal indicated:
 > YRT Services Corporation will raise $12 million through a private placement of convertible preferred stock. Of this amount, commitments in the amount of $7 million have been received since efforts were initiated in late September. The list of current investors is provided in Part I ...

 The YRTSC proposal, however, placed conditions on their financial commitments, as follows: Commitment, contingent on award of contract to YRTSC and successful placement of the Minimum Amount, are due by contract award, expected in January 1993. Funding to occur in August 1993.

12. YRT's proposal stated:
 > If YRTSC is selected as the next concessioner, we anticipate entering into immediate negotiations with MCA for a revision in repayment schedule base on prepayment of some amount. We would also negotiate a reasonable discount from face value of the note in return for immediate full payment in cash. With this agreement in hand, we are confident that the required funding will be secured.
 > Refinancing of the discounted MCA note will reduce substantially the $9 million annual debt service payments required under the MCA debt during the first four years.

13. The YRTSC proposal stated:
 > As requested by the NPS, we have included our most recent version of these projections in exhibits V.1, V.2, and V.3. These projections assume no changes in operations due to the implementation of the Concession Services Plan or the Housing Plan, for which a specific timetable was not provided. It is understood that any change in operations introduced by implementing actions under the CSP or Housing Plan will be subject to negotiation with the Park Service, including the level of contribution to the CIF.

14. In its proposal, YRTSC estimated that it would contribute a total of $103,327,000 to the Capital Improvement Fund over the life of the contract. This was based on a steadily increasing percentage to the Fund, ranging from 1% in 1994 to 6.8%, starting in 2002 until 2008. YRTSC estimated that the weighted average of these contributions would be 5.4% over the life of the contract.

translates to an average percentage of 2.0% of the present value of gross receipts.[15]

According to the proposer's figures, it will obtain a 14% before tax return on investment.

We feel that the proposer's estimate of general and administrative expenses begin somewhat higher and ended somewhat lower than might reasonably be expected. Adjusting those expenses accordingly would yield the proposer a before tax return on investment of approximately 14%, a reasonable return.

We noted, however, that this proposer limited its environmental remediation liability to $12.3 million. Any cost above this amount would, therefore, presumably be absorbed by the government.

Regarding liability for environmental remediation, the evaluation panel noted that YRTSC proposed to limit its liability to $12.3 million.[16] Presumably, under plaintiff's proposal, any cost above that amount was to be absorbed by the government.

Specifically, the plaintiff proposed:

YRTSC has forecast costs for such a program at $5 million over the first four years of the contract as shown in the financial projections. Beyond year four, an additional $7 million has been included in the forecasts for continued underground tank and other environmental cleanup costs.

At the end of year four, YRTSC will review the results of continuing monitoring and clean-up and reassess the estimated costs of clean-up. To the extent that in any year the amount spent in environmental clean-up is less than 75% of the YRTSC forecast amount, the difference will be held in a segregated sinking fund account. The Park Service may direct YRTSC to contribute funds from this sinking fund to the CIF. The government or MCA will indemnify YRTSC against environmental expenditures in any year for which such expenses exceed the YRTSC forecast amount, plus the amount accumulated in the sinking fund.

The selection panel found this limitation to be unacceptable, and wrote:

The offer also proposes to limit YRTSC's environmental mitigation liability to $12.3 million requiring indemnification from the government or MCA in this regard.... In any event, such ... limitation of liability could not be accepted, even if otherwise lawful and in the best interests of the government, without resolicitation of the concession opportunity because they constitute material changes to the terms of the solicitation for the benefit of the offeror.

Based on the documents and evaluation reports in the record, the Park Service used the same process to evaluate all the offers, including that of the plaintiff, YRTSC, and that of the applicant ultimately selected, Delaware North. Delaware North's proposal was found "successful" with regard to each criterion. In fact, it was the only application which achieved the "successful" rating in every category. For Criterion 15, the Park Service found Delaware North's offer "satisfactory" and concluded:

As evidenced by its balance sheet, this entity has the financial strength necessary to contribute $12 million towards equity.

No alternative financing to the MCA note has been proposed.

---

15. In the summary section of the selection panel's memorandum to the NPS Deputy Director, the selection official included the following explanation:

Four and fifteen year calculations of CIF contributions are included because of the four year franchise fee reconsideration periods set forth in the contract. Contributions after the first four years are subject to change. Accordingly, the level of contributions committed in the first four years is of greatest significance.

16. YRTSC budgeted $5 million over the first four years of the contract for environmental remediation and an additional $7 million for the remainder of the contract. Plaintiff proposed that: "The government or MCA will indemnify YRTSC against environmental expenditures in any year for which such expenses exceed the YRTSC forecast amount, plus the amount accumulated in the sinking fund."

The panel also found Delaware North's proposal to be "satisfactory" on Criterion 16 and observed:

> We conclude that the present value of the proposer's contribution to the CIF would be approximately $56.5 million over the life of the contract.[17] This translates to an average percentage of 5.2% of the present value of gross receipts.
>
> Considering only the first four years of the contract (recognizing that NPS will renegotiate the CIF percentage) the proposer's offer was $18 million. This translates to an average percentage of 5.2% of the present value of gross receipts.
>
> According to the proposer's figures it will obtain a 19% before tax return on investment.[18]
>
> We feel that the proposer's estimate of general and administrative expenses were higher than might reasonably be expected. Adjusting those expenses downward would yield the proposer a before tax return on investment of approximately 52%.
>
> This proposer indicated a willingness to assume whatever costs were necessary for environmental remediation, and estimated the costs to total $16.9 million.[19]

Therefore, to compare this proposal on an equal footing with the other proposals, recognizing that the environmental remediation costs are not known, we applied a similar expenditure ($12.5 million) and expenditure pattern as for the other evaluations. In doing so, we determined that the resulting return on investment would be 53%, only slightly higher than without the adjustment, mainly because most of the expenditure reduction occurs in the last years of projected occurrence. It is also noted that the CIF contribution under this proposal will drop to 4.7% in the event that if, upon closing, the net current liabilities of YPCC are not equal to net current assets. If this should occur, a 4.7% contribution only reduces the net present value of the proposed 5.2% contribution by $5,425,000 ($56,538,-000 reduced to $51,113,000) over a fifteen year period. This difference would not cause us to evaluate the proposal as marginal or unsatisfactory with respect to Criterion 16.

By contrast to YRTSC, Delaware North did not impose any limitations on environmental liability, and stated:

> e. Environmental/remediation
>
> Pursuant to the SOR, the Company will have responsibility for certain environ-

---

17. Delaware North estimated that it would contribute a total of $101,169,000 to the CIF over the life of the contract. This was based on constant projected contributions to the CIF in the amount of 5% of gross receipts. However, if the assets of YP & CC, the current concessioner, were not at least equal to liabilities on the Merger Date, then Delaware North indicated that its contribution to the CIF would be reduced to 4.5%. During the evaluation, however, for some reason, the National Park Service calculated Delaware North's CIF contribution as 5.2%, if YP & CC's assets were at least equal to liabilities, and 4.7% if YP & CC's assets were less than liabilities on the merger date, both for the duration of the contract, albeit subject to reconsideration every four years.

Regarding this discrepancy, at oral argument on the cross-motions for summary judgment, plaintiff's counsel explained the difference as follows: "And to avoid any confusion, I would hope counsel for Defendant would agree to the 4.7 is apparently a number that was derived by the Evaluation Panel based on some analysis like present value. But [it] is equivalent to the 4.5."

18. The 19% figure is also evident upon examination of the balance sheet submitted by Delaware North.

19. There is some question in the court's mind as to whether this proposal intended that liability extend to Delaware North Companies, Inc., its subsidiary, Yosemite Concession Services, Inc., or both. Delaware North is a holding company with stock in more than 150 other companies, which enjoys large revenues. Yosemite Concession Services, Inc. is a wholly owned subsidiary of Delaware North, which was incorporated with an initial $12,000,000 equity investment from Delaware North. During oral argument the court raised questions aimed at whether other assets of Delaware North (such as the Boston Bruins hockey team) would be at risk, or whether Delaware North had, in effect, capped its liability at $12,000,000, the net worth of Yosemite Concession Service. However, this issue was apparently not considered significant by either party, and, thus, the court will not attempt to create a dispute where the plaintiff has not challenged on the issue.

mental preservation and remediation activities. The projected expense related to such responsibilities is based upon a survey conducted by the Company's environmental consultants, ERM–West, Inc., adjusted for inflation. Management anticipates that all known potential environmental pollution exposures will be resolved by 2003.

Accordingly, both the evaluation panel and selection panel rated Delaware North "successful" on the environmental liability issue.

In response to Criterion 16, Delaware North expressed concern about possible changes in the scope of concession operations. Delaware North's proposal stated:

> The SOR provides that the implementation of the revised General Management Plan, Housing Plan, or Concession Services Plan in the future may affect the operations of the concessioner during the term of the Concession Contract. The scope and financial impact of such changes are not yet known and the NPS has directed in the SOR that applicants not take any such potential changes into account.
>
> Accordingly, DNC [Delaware North] management has assumed, for purposes of these projected financial statements, that no such changes will occur during the term of the Concession Contract and that should they occur, appropriate adjustments will be made to allow the Company to attain a reasonable return on its investment.

Apparently, on about December 8, 1992, Stephen Crabtree, chairman of the evaluation panel, phoned Dennis Szefel, of Delaware North to ask a question about the meaning of Delaware North's proposed CIF contribution should current liabilities of YP & CC exceed current assets at the time of the merger. The relevant section in Delaware North's proposal about which Crabtree inquired reads as follows:

> The Company has projected contributions to a Capital Improvement Fund in the amount of 5% of gross receipts ...
>
> ... DNC has assumed in the accompanying projections that the assets of YP &

CC at the Merger Date will include a sufficient amount of cash to equate current assets to current liabilities. In the event that such cash is not available, the Company's contribution to the Capital Improvement Fund would be reduced to 4½% of annual gross receipts and the projected financial statements would be revised accordingly.

According to Stephen Crabtree, after reviewing Delaware North's proposal, the evaluation panel was uncertain as to whether or not Delaware North intended to offer a CIF contribution of 5% or 4½%, so he asked: "Which is it?" According to Mr. Crabtree, Delaware North replied: "... it means just exactly what it says. If its current assets are less than current liabilities, we are for 4.5. If current assets are greater or equal to, we offer 5." Crabtree then conveyed that information to the evaluation panel. According to Crabtree, the phone conversation lasted less than a minute. There is no evidence in the record that any of the other offerors were contacted, nor is there any allegation or evidence that any offeror, including Delaware North, was permitted to change or supplement its proposal.

On December 10, 1992, the selection panel was briefed by the evaluation panel for a half day and then the selection panel deliberated separately. Only Delaware North received a "satisfactory" rating on each of the criteria in the Phase II SOR from the evaluation panel. The next week, the selection panel met in Washington, D.C. to present its recommendations to Herbert S. Cables, Jr., Deputy Director of the National Park Service, who endorsed the memo prepared by the selection panel. On December 17, 1992, the Park Service announced its selection of Delaware North Companies, Inc. as its next concessioner.

## DISCUSSION

### Request for Summary Judgment

■ Summary judgment in this court is properly granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as

a matter of law. Rule 56 of this court is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar in language and effect.[20] Both Rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c) of the Rules of this court provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of showing that there is no genuine issue of material fact and is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Rust Communications Group, Inc. v. United States*, 20 Cl.Ct. 392, 394 (1990); *Lima Surgical Ass'n, Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. 674, 679 (1990), *aff'd*, 944 F.2d 885 (Fed.Cir.1991).

■ Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury [judge] could return a verdict for the non moving party." *Id.; see also Uniq Computer Corp. v. United States*, 20 Cl. Ct. 222, 228–29 (1990).

■ When reaching a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. at 2510; *see, e.g., Cloutier v. United States*, 19 Cl.Ct. 326, 328 (1990), *aff'd*, 937 F.2d 622 (Fed.Cir.1991). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, and then may also determine that the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. at 2511–12. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. As indicated above, any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see also Litton Industrial Products, Inc. v. Solid State Systems Corp.*, 755 F.2d 158, 163 (Fed.Cir. 1985); *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

■ The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if

20. By enactment of the Court of Federal Claims Technical and Procedural Improvements Act of 1992, Pub.L. No. 102–572, the United States Claims Court was renamed the United States Court of Federal Claims. In accordance with General Order 33 issued by the United States Court of Federal Claims, the court adopted the rules of the United States Claims Court. The substance of the rules of the court, discussed herein, are unaffected by the legislation, other than with respect to the name change of the court and, therefore, the name change of the rules. However, General Order 33 also indicates that if there is a conflict between the new statute and the rules, the statute will control. RUSCC stands for Rules of the United States Claims Court, now the Rules of the United States Court of Federal Claims, which is abbreviated RCFC.

In general, the Rules of this court are closely patterned upon the Federal Rules of Civil Procedure. Therefore, precedent under the Federal Rules of Civil Procedure is relevant to interpreting the Rules of this court, including Rule 56. *See Imperial Van Lines Int'l, Inc. v. United States*, 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States*, 17 Cl.Ct. 67, 70 (1989).

the moving party can show, alternatively, that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986); *see also Lima Surgical Assoc.*, 20 Cl.Ct. at 679. If the moving party makes either showing, the burden is placed on the non-moving party to show that a genuine factual dispute exists by presenting evidence establishing the existence of an element of its case upon which it bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. at 2552; *Lima Surgical Assoc. Ass'n*, 20 Cl.Ct. at 679. If, under no scenario, can the nonmoving party present the evidence to support its case, then there should be no genuine need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Under Rule 56, the motion for summary judgment may succeed, whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553. Generally, however, in order to prevail, the nonmoving party will need to go beyond the pleadings, by use of evidence such as affidavits, depositions, answers to interrogatories and admissions, in order to show that a genuine issue for trial exists. *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553.

Both parties have filed motions for summary judgment and stated that there are no genuine issues of material fact in dispute to preclude summary judgment. With respect to the question of whether or not there are genuine issues of material fact in dispute, however, plaintiff has not always been consistent. Although defendant has consistently maintained that there are no material issues of fact in dispute, plaintiff has taken a more complex position. Plaintiff has filed its own cross-motion for summary judgment, asserting that the record before the court is essentially fully developed, but, at the same time, arguing that there are material facts in dispute regarding the issues raised in defendant's motion for summary judgment.

Both defendant's and plaintiff's counsel have opined that little would be gained by going to trial. Despite the request by plaintiff's counsel that defendant's motion for summary judgment be denied, plaintiff's counsel stated that the record would not be improved by hearing live testimony, or hardly expanded, if summary judgment were to be denied by the court. In fact, both parties seem to agree that between the two Appendices submitted, one by plaintiff and one by defendant, which total approximately 1900 pages, that the parties have offered a complete record to which very little could be added:

> MR. VICTORINO: ... with respect to the need of a trial, we understand, and we will clarify here today, that there very well may be some issues of fact that are not stipulated or are in dispute.
>
> However, I think we are both in agreement that I don't think the record will be improved by having live testimony. We think the record is probably going to be about as good as it is.

Later, plaintiff reemphasized this point:

> MR. VICTORINO: ... My feeling was that while there are issues that are in contention, that we cannot agree on, I don't think there is anything that we can add that wasn't covered in deposition. Or Your Honor may have to take a deposition statement of one person and compare it to another, and maybe some documents, and decide what the truth is.
>
> ... my view is I don't think the record would be improved, certainly not substantially, by having live testimony.

Indirectly, defendant's counsel also indicated that the record was complete. "... the briefing has been extensive, notwithstanding the time crunch. I get the feeling the case has been briefed to within an inch of its life as well as maybe having been appendixed to within an inch of its life as well."

Because of the inconsistencies regarding the need to develop additional evidence at a trial, during the oral argument on the cross-motions for summary judgment, the court asked plaintiff to clarify its position regarding whether material issues of fact

in dispute were present in the case, and, if so, to specifically identify any such disputed facts. There occurred three separate discussions between the court and plaintiff's counsel regarding which material facts were claimed to be in dispute by plaintiff. The first colloquy was somewhat difficult for the court to follow. Therefore, the court repeated its question to plaintiff's counsel:

THE COURT: I'm asking you again, because I still don't know the answer. Are there or are there not material issues in dispute? You give me these double barreled answers that say on one scenario there are not, on another scenario there are.

MR. VICTORINO: There are clearly issues of fact in this case.

THE COURT: Are they material?

MR. VICTORINO: Yes.

THE COURT: What are they? Give me a list.

MR. VICTORINO: Those are the ones that we just mentioned.

THE COURT: Okay. All of those are material issues in dispute—

MR. VICTORINO: Yes.

THE COURT: Then how could you have cross moved for summary judgment?

MR. VICTORINO: Because those issues aren't at issue on the areas that we raised on motion for summary judgment. Those are issues raised by Defendant's case and Defendant's motion for summary judgment.

Later, during the oral argument, and at the court's urging, plaintiff recapitulated its list of those proposed findings of uncontroverted fact, offered by the plaintiff or the defendant, which plaintiff maintains are material facts in dispute, and which, according to plaintiff, should preclude summary judgment for the defendant:

THE COURT: ... so let me review this list with you once again, because this is going to become critical.

Plaintiff's Uncontroverted Facts 82, 83, 84, 86, 87, 97, 105, 114, 118, 125, 130, 131, 132, 133 and 135, is that correct, Mr. Victorino? Those are items that you believe, as I understand it, correct me if I'm wrong, that you believe are material facts in dispute based on the record that's before the Court.

MR. VICTORINO: Yes. And I emphasize material.

THE COURT: Material. Absolutely. They have to be material to get us past summary judgment, ...

As to material facts in dispute with regard to the Defendant's Proposed Findings of Uncontroverted Fact, the same statement that these are material facts in dispute that would, in the opinion, of the Plaintiff, defeat summary judgment, numbers 18, 29, 34, 37. Is that correct, Mr. Victorino.

MR. VICTORINO: Yes.

THE COURT: All right.

I propose to take you at your word, Mr. Victorino, and take those numbers as the facts on which the Court needs to rule as to whether there are material facts in dispute, and use that as the basis for deciding whether or not summary judgment is appropriate here.[21]

■ The fact that both parties have moved for partial or full summary judgment, based on the alleged absence of genuine issues of material fact, does not relieve the court of its responsibility to determine the appropriateness of summary disposition in the particular case. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987)). "Simply because both parties moved for summary

---

21. At the oral argument, plaintiff at first also identified defendant's proposed findings of fact no. 44 as a material fact in dispute. Later, during the same argument, plaintiff's counsel, however, left defendant's proposed findings of uncontroverted facts 44 off his final lists, which appear above. The parties clearly disagree on the relevance and or significance of defendant's

44. But in the interests of expediency, the court, nonetheless, has reviewed defendant's 44 and finds that defendant's 44 actually raises no real factual dispute concerning the evaluation panel's assessment of Delaware North's proposed CIF contribution and, therefore, need not be addressed in this opinion.

judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692–93 (4th Cir.1968), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969). *See also Levine v. Fairleigh Dickinson Univ.*, 646 F.2d 825, 833 (3d Cir.1981); *Home Ins. Co. v. Aetna Cas. & Sur. Co.*, 528 F.2d 1388, 1390 (2d Cir.1976). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not establish that if one is rejected the other is necessarily justified. *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir.1968). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors, Inc. v. United States*, 812 F.2d at 1391.

After a careful review of the record filed in the instant case and the proposed findings of uncontroverted fact which plaintiff has listed as precluding summary disposition of this case, the court can find no reason why summary judgment should not be granted. The "facts" identified by the plaintiff as material facts in dispute do not entitle plaintiff to summary judgment because they are questions of law and not issues of fact, they are facts in dispute which do not affect the ultimate outcome of the instant litigation, and are, thus, not material, there is an absence in the record (which the plaintiff has conceded is probably nearly as complete as it could be) of evidence to support the plaintiff's case, or, plaintiff has failed to establish the existence of an element of its case upon which plaintiff bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). Moreover, as will be discussed below, plaintiff has failed to show that the government acted in an arbitrary and capricious manner, thus breaching its duty to fairly and honestly consider plaintiff's proposal. The court, therefore, GRANTS defendant's motion for summary judgment. Plaintiff's cross-motion for summary judgment is, hereby, DENIED.

### *Plaintiff's Request for a Permanent Injunction to Enjoin the Selection of Delaware North*

Plaintiff initially requested a temporary restraining order and preliminary injunction to prevent the defendant from awarding a contract until such time as this litigation could be resolved. However, because defendant voluntarily agreed to withhold any award pending notification of the court, the case was converted to one for a permanent injunction and the cross-motions for summary judgment currently before the court were filed.

 Injunctive relief is considered a drastic measure, and when such relief is requested, the court should exercise caution. *N.V. Philips Gloeilampenfabrieken v. United States*, 1 Cl.Ct. 783, 784 (1983). Moreover, judicial review of an agency's preaward procurement decision is limited in scope. *Magnavox Elec. Sys. Co. v. United States*, 26 Cl.Ct. 1373, 1380 (1992); *RAD-VA Corp. v. United States*, 17 Cl.Ct. 812, 818 (1989), *aff'd*, 914 F.2d 271 (Fed.Cir. 1990); *Drexel Heritage Furnishings, Inc. v. United States*, 3 Cl.Ct. 718, 721 (1983); *Baird Corp. v. United States*, 1 Cl.Ct. 662, 664 (1983). Frustrated bidders, however, have a right to seek redress in the federal courts for alleged arbitrary or capricious actions on the part of contracting officers. *Scanwell Labs., Inc. v. Shaffer*, 424 F.2d 859 (D.C.Cir.1970). Elaborating on *Scanwell*, in *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289 (D.C.Cir.1971), the court addressed the deference federal courts should give to agency decision making in contract matters, and articulated the test for review of a contracting officer's decision. In order to succeed in a request for injunctive relief, a plaintiff must meet the heavy burden of showing that there was no rational basis for the agency's decision. *Steinthal*, 455 F.2d at 1301, 1306; *Southwest Marine, Inc. v. United States*, 3 Cl.Ct. 611, 613 (1983); *AABCO, Inc. v. United States*, 3 Cl.Ct. 109, 113 (1983); *Baird Corp. v. United States*, 1 Cl.Ct. 662, 664 (1983). More-

over, great deference is accorded to pre-award agency procurement decisions. *RADVA Corp. v. United States,* 17 Cl.Ct. at 818. It is through a narrow lens, therefore, that this court is charged with determining whether the government has satisfied the implied contractual condition that each bid, received by the government in response to a request for proposals, will be fairly and honestly evaluated. *National Forge Co. v. United States,* 779 F.2d 665, 667 (Fed.Cir.1985); *CACI, Inc. v. United States,* 719 F.2d 1567, 1573 (Fed.Cir.1983); *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 909 (Fed.Cir.1988); *Coastal Corp. v. United States,* 713 F.2d 728, 730 (Fed.Cir.1983); *Skytech Aero, Inc. v. United States,* 26 Cl.Ct. 251, 253–54 (1992); *Celtech, Inc.–Federal v. United States,* 24 Cl. Ct. 269, 273 n. 1 (1991); *Data Transformation Corp. v. United States,* 13 Cl.Ct. 165, 171 (1987); *Dynalectron Corp. v. United States,* 4 Cl.Ct. 424, 428, *aff'd,* 758 F.2d 665 (Fed.Cir.1984); *Space Age Eng'g, Inc. v. United States,* 4 Cl.Ct. 739, 741 (1984).

■ The plaintiff YRTSC bears the burden of showing by a preponderance of the evidence that the selection was irrational or involved a violation of applicable statutes or regulations, *Quality Transport Services, Inc. v. United States,* 12 Cl.Ct. 276, 281 (1987), and, therefore, that the government has breached its duty to fairly and honestly consider its proposal. *Harris Data Communications, Inc. v. United States,* 2 Cl. Ct. 229, 237, *aff'd mem.,* 723 F.2d 69 (Fed. Cir.1983). The disappointed bidder must show that the government acted in an arbitrary and capricious manner in its selection. *Tidewater Management Servs., Inc. v. United States,* 216 Ct.Cl. 69, 72, 573 F.2d 65, 67 (1978); *Keco Industries, Inc. v. United States (I),* 192 Ct.Cl. 773, 782, 428 F.2d 1233, 1238 (1970); *Keco Industries, Inc. v. United States (II),* 203 Ct.Cl. 566, 574, 492 F.2d 1200, 1203–04 (1974). As stated by the United States Court of Appeals for the Federal Circuit, a court will not find a breach by the government official and intervene unless it has been clearly determined that the agency in reaching its determination acted in an arbitrary and capricious manner when it rejected plaintiff's bid. *CACI, Inc–Federal v. United States,* 719 F.2d 1567, 1573 (Fed.Cir.1983); *Magnavox Elec. Sys. Co. v. United States,* 26 Cl.Ct. 1373, 1380 (1992); *Skytech Aero, Inc. v. United States,* 26 Cl.Ct. 251, 254 (1992); *Excavation Constr. Inc. v. United States,* 204 Ct.Cl. 299, 302, 494 F.2d 1289, 1290 (1974).

■ In *Keco Industries, Inc. v. United States,* 203 Ct.Cl. 566, 574, 492 F.2d 1200, 1203–04 (1974) (*Keco II*), the Court of Claims set forth four factors to be considered when determining whether the government acted arbitrarily or capriciously towards a bidder-claimant: 1) whether the government procuring officials acted in bad faith, thus depriving the bidder of fair and honest consideration of its proposal; 2) whether there was a reasonable basis for the government's decision; 3) the degree of discretion given to the procurement officials by applicable statutes and regulations; and, 4) whether government officials violated pertinent statutes or regulations, which, if violated, may form the basis for recovery, but which need not automatically constitute grounds for recovery. *Keco II,* 203 Ct.Cl. at 574, 492 F.2d at 1203–04.

In *Tidewater Management Services, Inc.,* the United States Court of Claims amplified on the analytical framework established in *Keco II,* by which plaintiff must prove that the government's action was arbitrary and capricious in order to recover. The Court stated:

> Arbitrary and capricious action on the part of the Government may be shown by proof that there existed no reasonable basis for the award of the contract to another. *Continental Business Enterprises, Inc. v. United States, supra,* 196 Ct.Cl. at 637–38, 452 F.2d at 1021; *Keco Industries (II) v. United States,* 203 Ct. Cl. 566, 574, 492 F.2d 1200, 1203–04 (1974). Subjective bad faith on the part of the procuring officials is such proof. *Heyer Products Co. v. United States* [135 Ct.Cl. 63, 140 F.Supp. 409 (1956)], *supra; Keco Industries (II) v. United States, supra.* Proof that the procuring officials violated 'pertinent statutes or

regulations can, but need not necessarily, be a ground for recovery.' *Keco Industries (II) v. United States, supra,* 203 Ct.Cl. at 574, 492 F.2d at 1204.

*Tidewater Management Services, Inc.,* 216 Ct.Cl. at 73, 573 F.2d at 67.

■■■ A situation similar to the facts presented by the instant case was faced by the court in *Quality Transport Services, Inc. v. United States,* which articulated an applicable standard of review:

> Having moved for summary judgment, defendant now contends that plaintiff must show a strong likelihood of success by clear and convincing evidence. Defendant agreed to withhold award of the subject contract until April 30, 1987, so that plaintiff's challenge could be adjudicated. By doing so, defendant obviated the need to rule on the application for a temporary restraining order and motion for preliminary injunction. At issue is whether plaintiff is entitled to an injunction prohibiting the award of the subject contract to anyone other than plaintiff, not whether plaintiff qualifies for an interim injunction. In short, the question is not whether plaintiff can show a strong likelihood of success, but whether plaintiff succeeds in showing by a preponderance of evidence either that the contracting officer's decision was irrational or involved a violation of statutes or regulations. *See Harris Data Communications, Inc. v. United States,* 2 Cl.Ct. 229, 237, *aff'd mem.,* 723 F.2d 69 (Fed.Cir.1983).

*Quality Transp. Services, Inc. v. United States,* 12 Cl.Ct. 276, 281 (1987). Unlike the requirements for issuance of a preliminary injunction, to succeed on a request for a permanent injunction, plaintiff must meet its burden of proof and actually succeed on the merits. *Howell Const. Inc. v. United States,* 12 Cl.Ct. 450, 453 (1987); *Drexel Heritage Furnishings v. United States,* 7 Cl.Ct. 134, 143 (1984).

By reviewing the list of facts allegedly in dispute according to the plaintiff, the court feels it has also covered the issues pertinent to deciding the merits of the case raised by the plaintiff regarding the NPS solicitation for concession services in Yo-

semite Park. In an effort to simplify the ensuing discussion, and to avoid repetitive discussions, the court has chosen to address the proposed findings of fact, alleged by plaintiff to be in dispute, by grouping them in subject matter categories. Although some repetition is necessary, where possible, the court has also attempted to refer the reader back to earlier discussions regarding recurring points.

*Plaintiff's Proposed Findings of Uncontroverted Fact 82, 84, 97 and 105*

> *Plaintiff's 82*—In evaluating the YRTSC offer, NPS required 'compelling evidence' that YRTSC had $12 million in equity for working capital.
>
> *Plaintiff's 84*—NPS determined that YRTSC did not present compelling evidence that YRTSC had $12 million at the time of the offer and for that reason rated YRTSC unsuccessful on Criterion 15.
>
> *Plaintiff's 97*—NPS has determined that YRTSC met this [that YRTSC demonstrate the Phase I requirement with *reasonable assurances* that it had the ability to provide not less than $12 million of initial equity capital to undertake the concession operation] requirement.
>
> *Plaintiff's 105*—YRTSC believed that lack of *binding* commitments would not preclude YRTSC from consideration and, as stated in the proposal and the accompanying proposal letter, believed that more time would be allowed to submit information.

*Compelling Evidence of Plaintiff's Ability to Obtain a Minimum of $12 million in Equity For Working Capital*

■■■ As described above, plaintiff's counsel identified plaintiff's proposed findings of uncontroverted fact 82, 83, 84, 86, 87, 97 and 105 as material issues of fact in dispute. These items all relate to the issues raised in counts I, II and IX of plaintiff's complaint and relate to plaintiff's allegation that YRTSC should not have been found "unsuccessful" on Criteria 15 and 16 of the Phase II SOR. Plaintiff alleges that during the evaluation, the NPS incorrectly interpreted the Phase II SOR provision,

that an offeror provide a minimum of $12 million as initial equity for working capital, to require applicants to document the availability of those commitments at the time of the application. Plaintiff maintains that NPS improperly treated this issue as one of responsiveness, and rated YRTSC "unsuccessful" on criterion 15. Therefore, according to YRTSC, its offer was improperly eliminated without comparison to the other offers. Plaintiff, moreover, maintains that YRTSC had adequately demonstrated the ability to provide $12 million in equity capital under the Phase I standard of "reasonable assurances."

The applicable SOR provisions regarding the proposer's ability to obtain the necessary financing are found in the application section of the Phase II SOR. In pertinent part, they state:

> 5. The applicant will provide a minimum of $12 million as initial equity for working capital. That amount is intended to include the amount reimbursable to NPF [the National Park Foundation] as described at page 9 of BUSINESS OPPORTUNITY, *Purchase of Existing Assets and Business. This must appear on the books of the New Concessioner as equity, not debt.* Make sure that these commitments are reflected in the financial information provided. Describe the source of and terms for these funds. [Emphasis added.]
>
> 6. *Identify the source of any financing* needed. Document the availability of financing with financial statements, financing agreements and letters of intent from lenders. Present *compelling evidence* of proposers ability to obtain the necessary financing. Be specific. Identify all sources.
> *Describe the financial terms* of each proposed financing source. Explain the financial arrangements you propose to use to finance any acquisition debt and to provide working capital.
> *If funds are to be raised from individuals,* the APPLICANT must submit sufficient documentation to demonstrate, *in a compelling way,* the availability and commitment of such funds. [Emphasis added.]

Initially, the court notes that the interpretation of the terms of a government contract is a matter of law. *Fortec Constructors v. United States,* 760 F.2d 1288, 1291 (Fed.Cir.1985); *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 386, 351 F.2d 972, 973 (1965). The language of a contract must be given the meaning that would be derived from the contract by a "reasonably intelligent person acquainted with the contemporaneous circumstances." *Id.,* 169 Ct.Cl. at 388, 351 F.2d at 975. Only when the language of a contract is ambiguous will factors outside of the contract terms be taken into account. *See Sylvania Elec. Prods., Inc. v. United States,* 198 Ct.Cl. 106, 126, 458 F.2d 994, 1005 (1972). When interpreting the language of a contract, a court must give reasonable meaning to all parts of the contract and not render portions of the contract meaningless. *Fortec Constructors,* 760 F.2d at 1292; *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1555 (Fed.Cir.1983). By analogy, the terms of a SOR, which is part of the government contracting process, should be interpreted in the same way. If the words of the SOR are clear, it is not the role of the court to second guess the plain meaning of those words by reaching beyond them for an interpretation.

The words of the Part V *Financial Operations & Financing,* Phase II SOR, when read as a whole, make it perfectly clear that NPS intended that the evaluators use the "compelling evidence" standard to review the Phase II applicants' description of funds raised, to meet the minimum $12 million equity position requirement. Part V reads: "If funds are to be raised from individuals, the APPLICANT must submit sufficient documentation to demonstrate, in a *compelling* way, the availability and commitment of such funds." (Emphasis added.) Nevertheless, plaintiff argues that pursuant to the terms of the Phase II SOR:

> Financing as is used in this paragraph, includes loans. Loans, however, are specifically excluded from the definition of equity for working capital by paragraph 5 [of the Phase II SOR]. The compelling

evidence requirement of paragraph 6, therefore, cannot apply to the $12 million in equity for working capital. Paragraph 6, then, applies to loans that an offeror plans to use in connection with its proposal.

To determine which standard the evaluation team should use to evaluate an applicant's response to the equity capital requirement, plaintiff, therefore, asks the court to go outside the Phase II document, back to the Phase I SOR, and adopt the Phase I standard of "reasonable assurance" with respect to an applicant's proof of $12 million equity for working capital. If the Park Service was concerned about contracting with a financially viable organization, which it clearly was, why would NPS ask for "compelling evidence" only of loans, as plaintiff contends, but not ask for "compelling evidence" of the other sources of money to demonstrate the equity position of applicants?

Although plaintiff urges that the court reach back to the Phase I SOR to adopt a "reasonable assurance" standard for the equity capital requirement, this court will not do so. The language of the Phase II SOR is not ambiguous. The Park Service acted reasonably when it refused to take into account factors outside of Phase II SOR document and applied the "compelling evidence" test.

■ Plaintiff also contends that during the Phase I SOR evaluation the Park Service had already determined that YRTSC met the equity capital requirement. However, it appears to the court that because the purposes of the Phase I SOR and the Phase II SOR were different, a changed standard on evidence is not unreasonable. The Phase I objective was to screen applicants to establish a pool of eligible applicants, but not to make a final selection of a concessioner. As stated in an unsigned cover memorandum, dated April 4, 1992, sent to prospective applicants along with the Phase I SOR: "We hope, from Phase I, to have a list of those who would like to take a detailed look at our proposition and who are financially and managerially likely to be able to be competitive." By contrast,

the Phase II SOR was designed to effect the final selection of a concessioner, by which a close relationship, to last at least 15 years would commence. It is, therefore, reasonable that the NPS would insert a more stringent standard for final selection in Phase II of the SOR than in Phase I.

Moreover, the Phase II SOR, by its terms, explicitly distinguishes between Phases I and II of the SOR, to the point that documents considered under one phase of the SOR are not to be used in the other. The Phase II SOR states:

Documents submitted under the Phase I process should be regarded as being for that purpose only. They will not be used by the Service in evaluating offers under Phase II. Except for the purpose of addressing the specific criteria of Phase I, the Service neither accepts or rejects any of the proposals or ideas included in submittals under Phase I.

■ Plaintiff also maintains that the evaluation process was flawed because the individuals conducting the Phase I evaluation were largely the same individuals who served on the Phase II Evaluation Panel, and that the panel members, therefore, had seen the financial materials submitted during Phase I. Plaintiff reasons, therefore, that because the Phase I financial materials had been reviewed and discussed by some of the evaluators during the Phase I evaluation, those materials should be considered part of the relevant record for the Phase II selection process, and not excluded from Phase II consideration on the requirement for $12 million in equity for working capital.

This court, however, finds that the overlap of personnel on the evaluation and selection panel does not automatically result in a merger of the Phase I and Phase II evaluation processes. Plaintiff has failed to document that during the Phase II evaluation, the panel actually utilized or relied on any of the materials submitted during Phase I. Even if some of the individuals conducting the Phase I evaluation were on the Phase II evaluation panel, it is not clear that documents submitted during Phase I should have been considered in evaluating

offers under Phase II, or, in fact, were referred to during the Phase II evaluation. The selections from the depositions of Maurice Robinson and David Dornbusch provided to the court by the parties, and cited to by plaintiff, are not helpful to plaintiff's point that the Phase I materials should be used in the Phase II evaluation. In fact, a close reading of the Dornbusch deposition makes it clear that he understood he was not to rely on information which had been submitted in response to the Phase I SOR during the Phase II evaluation. Accordingly, the court finds that the plain meaning of the words of the Phase II SOR is that NPS clearly announced to all applicants, including YRTSC, that it intended to use the "compelling evidence" standard to evaluate financial operations and commitments, including the requirement for a minimum of $12 million in equity capital under the Phase II SOR. This court finds the actions of the NPS reasonable.

*Plaintiff's Proposed Findings of Uncontroverted Fact 83, 86 and 87*

*Plaintiff's 83*—Under the NPS interpretation, YRTSC had to have binding commitments for the $12 million *at the time of the offer;* YRTSC had to show that it had the money *available at the time of the offer.* [Emphasis in original.]

*Plaintiff's 86*—NPS treated this requirement for evidence of working capital at the time of the offer as a responsiveness issue. Because, in the view of NPS, YRTSC did not meet the standard the SOR required, YRTSC was not considered further and precluded from selection as the new concessioner.

*Plaintiff's 87*—Because YRTSC received unsuccessful ratings on Criteria 15 and 16, neither the Evaluation Panel nor the Selection Panel took YRTSC's offer to the next stage for evaluation of the offer as a whole against the other offers.

▆▆▆▆ Plaintiff next alleges that the Park Service improperly required YRTSC to have binding commitments for equity capi-

tal at the time the application was submitted, instead of at the time the contract was awarded. Plaintiff characterizes the Park Service's evaluation of the equity capital requirement as tantamount to a responsibility determination, and argues that by finding YRTSC "unsuccessful" on the financing issue, NPS also found plaintiff's application non-responsive. Therefore, plaintiff maintains that NPS breached its duty to consider YRTSC's offer fully and fairly by eliminating plaintiff from consideration. Plaintiff stated:

> NPS improperly based its negative responsibility determination solely on the materials in the Phase II offer. Instead of inquiring about YRTSC's working capital, NPS rejected its proposal as non-responsive and gave it no further consideration.

Plaintiff alleges that YRTSC should have been allowed to present evidence regarding responsibility anytime before award. 48 C.F.R. § 9.105–1(b) (1991).[22] At oral argument, plaintiff's counsel also argued that, notwithstanding any authority the NPS might have under the CPA, the concepts of responsiveness and responsibility have been long established, that they predate the Competition in Contracting Act (CICA), and that they are "fundamental principles" of federal procurement. In response, defendant contends that CICA is not applicable to concession contracts awarded by the National Park Service because CICA, although generally applicable to procurement activities, contains an express exclusion for "procurement procedures otherwise expressly authorized by statute." 41 U.S.C. § 253(a)(1) (1988). Defendant also reasons that if CICA is not applicable to concessions contracts, then the "federal norm" relied on by plaintiff regarding the concepts of responsibility and responsiveness also has no applicability to the instant case. Defendant further argues that the Secretary of the Interior is expressly, and separately authorized, in the Concessions Policy Act (CPA) to contract for concessions in

---

**22.** The court notes, in any event, that an agency is not required to delay selection or awards indefinitely, while an offeror attempts to overcome a non-responsibility determination. *See*

*Dock Express Inc.,* Comp.Gen.Dec. B–227865.3 (Jan. 13, 1988), 88–1 C.P.D. ¶ 23, p. 7; *Roarda, Inc.,* Comp.Gen.Dec. B–204524.5 (May 7, 1982), 82–1 C.P.D. ¶ 438, p. 6.

national parks. Sections 2 and 3 of the CPA, 16 U.S.C. §§ 20a & 20b (1988), give the Secretary broad discretion to include in the final contract terms and conditions appropriate to carry out his mission under the Act. More important, however, as pointed out by defendant, NPS has promulgated its own regulations to give effect to the CPA. 36 C.F.R. §§ 51.1–51.7 (1992).

The question of whether or not concession contracts awarded pursuant to the CPA should be subject to Federal Acquisition Regulations (FAR) has been a matter of some debate. The Comptroller General has held that when the Department of the Interior issued a permit in exchange for a franchise fee, as authorized by the concessions statute, such was not a procurement of property or services within the meaning of the Competition in Contracting Act, and, therefore, the FAR was not applicable. *Crystal Cruises, Inc.*, Comp.Gen.Dec. B–238347.2 (June 14, 1990), 90–1 C.P.D. ¶ 560, pp. 2–3. In *Crystal Cruises*, the Comptroller General states: "We found that the issuance of a permit for a franchise fee granting a right of access to government land and property under the authority of 16 U.S.C. § 3, which provides for the granting of such concessions by the Secretary of the Interior, is not a procurement of property or services within the meaning of CICA." Likewise, the Comptroller General earlier had noted that procurements conducted under the authority of the Public Concessions Act (Concessions Policy Act) were not subject to the Competition in Contracting Act, and that the FAR did not apply. *Stephen*

*Sloan Marine Corp.*, Comp.Gen.Dec. B–234219 (May 9, 1989), 89–1 C.P.D. ¶ 435, p. 4.[23]

In order to finally resolve whether a concession contract should conform to standard procurement rules, the Department of the Interior published a final rule in the Federal Register on September 3, 1992, to clarify that Federal Acquisition Regulations do not apply to such concession contracts. The regulation, however, was published after the Phase I and Phase II SORs in the instant case were issued, on April 1, 1992 and July 15, 1992, respectively, but before the applications were due for submission to NPS on November 16, 1992, and before the selection was made on December 17, 1992. The new regulation clearly states:

> All concession contracts and permits are subject to the requirements of this part 51. They are not federal procurement contracts or permits within the meaning of statutory or regulatory requirements applicable to federal procurement actions.

57 Fed.Reg. 40,496 (1992) (to be codified at 36 C.F.R. § 51). The plaintiff questions the legality of this action, maintaining that the Park Service cannot, by regulation, exempt itself from the Competition in Contracting Act. Because of the date of the issuance of the new regulation, however, the court has not relied on it in this decision.

By its own terms, CICA does not encompass procurement procedures which are

---

**23.** To the contrary, prior to the Comptroller General's decision in *Stephen Sloan Marine Corp.*, the Department of the Interior Board of Contract Appeals had held that, given the facts presented in that case, a concession contract was a procurement contract which disavowed any purpose to help the contractor make a profit, but was rather to acquire goods and services, and thus should be considered within the scope of the Contract Disputes Act and the FAR as a contract to facilitate goods and services. *R & R Enterprises*, 89–2 B.C.A. (CCH) ¶ 21,708 at 109, 147, 1989 WL 27790 (IBCA 1989). Moreover, the case cited to in *R & R Enterprises* concerns a grant assistance award and not a concessions contract. *See also* the decision in *Yosemite Park & Curry Co. v. United States*, in which the court held that a purchase for transportation services

by the NPS "is within the purview of normal procurement statutes and implementing regulations." In *Yosemite Park and Curry Co. v. United States*, 217 Ct.Cl. 360, 372, 582 F.2d 552, 558, 559 (1978), the Court of Claims recognized the Park Service's broad concession granting authority, but held that this authority did not serve to exempt NPS from procurement regulations when bargaining for, paying for and receiving transportation services. In the case at bar, however, unlike in Yosemite, the Park Service is not paying for transportation services but collecting fees in exchange for granting a permit to operate a concession business. Thus, this arrangement does not constitute a procurement, but is a grant of a permit to operate a business and the government is not committing to pay out government funds or incur any monetary liability.

otherwise expressly authorized by other statutes. 41 U.S.C. § 253(a)(1) (1988). Moreover, it is clear that the CPA intended to authorize the Secretary of the Interior to award concessions contracts, and for the Secretary to exercise a great deal of discretion in choosing the means to do so, even if those actions are not in compliance with the FAR. The Concessions Policy Act is codified at 16 U.S.C. § 20a (1988), and reads in pertinent part:

[t]he Secretary of the Interior shall take *such action as may be appropriate* to encourage and enable private persons and corporations (hereinafter referred to as "concessioners") to provide and operate facilities and services which he deems desirable for the accommodation of visitors in areas administered by the National Park Service. (Emphasis added).

Significantly, in both the Phase I and Phase II solicitation packages, distributed to all applicants, the applicants were alerted to the difference between the concession contract application process and traditional government contracting. In the Phase I SOR, the following words appear: "This Phase I–SOR is issued under rules and Federal Regulations unique to the NPS Concession Management Program." Likewise, in the Phase II SOR, the NPS wrote:

This SOR is issued under rules unique to the National Park Service Concession Management Program. The Concession [sic] Policy Act (PL 89–249) is included with this document. Regulations are at 36 C.F.R. 51 and are under revision. Not all terms of the CONTRACT are discussed here. Applicants should carefully review all provisions of the draft CONTRACT.

This court, therefore, recognizes that the concession contract disputed in the instant case was issued pursuant to the CPA and is unique from a standard government contract. Accordingly, for all the reasons discussed above, this court will treat the concessioner selection process in this case as not subject to the FAR.

■ However, for argument's sake, even applying the standards of the Federal Acquisition Regulations (FAR), it is clear that during the SOR evaluations at issue, the Park Service did not make a negative responsibility determination of YRTSC's proposal, nor was YRTSC's proposal arbitrarily or capriciously eliminated from further consideration.[24] Moreover, before making a non-responsibility determination under the FAR, the responsible government official must fulfill certain procedural and documentation requirements, in part because the effect of a non-responsibility determination is to preclude further consideration for an award, and because no standard contract award may be made unless the prospective contractor is affirmatively determined by the contracting officer to be responsible. See 48 C.F.R. §§ 9.101–9.105–2 (1991). In making a responsibility determination, a contracting officer must consider, among other factors: financial resources; ability to comply with the proposed performance schedule; past performance record; past record of integrity; existence of the necessary organization, experience, operational controls, technical skills and quality assurance measures; whether the offeror has a satisfactory record of integrity and business ethics, and whether the offeror possesses the necessary facilities or has the ability to obtain them. 48 C.F.R. § 9.104–1 (1991).

If a non-responsibility determination is made, it must be documented. The FAR requires that:

*Determinations....* When an offer on which an award would otherwise be

---

**24.** Although not under the FAR, the Park Service, nonetheless, adopted its own screening concept of responsiveness in its Phase II Statement of Requirements:

APPLICATIONS WILL FIRST BE SCREENED FOR COMPLETENESS. IF AN APPLICANT FAILS TO COMPLETE ANY PART OF THE APPLICATION, THE PROPOSAL MAY BE CONSIDERED TO BE NON–RESPONSIVE.

However, the requirement placed on applicants to provide a minimum of $12 million in equity financing was included in the portion of the application to be reviewed not only for completeness, but also in comparison to the other applications received.

made is rejected because the prospective contractor is found to be nonresponsible, the contracting officer shall make, sign, and place in the contract file a determination of nonresponsibility, which shall state the basis for the determination.

\* \* \* \* \* \*

*Support documentation.* Documents and reports supporting a determination of responsibility or nonresponsibility, including any preaward survey reports and any applicable Certificate of Competency, must be included in the file.

48 C.F.R. §§ 9.105–2(a) & 9.105–2(b) (1991).

In the instant case, plaintiff has offered no evidence of documents or reports in the record to support that a final determination of non-responsibility by a selection official was made. Rather, as is more fully discussed below, the record demonstrates that plaintiff's application was evaluated and considered by the evaluation panel, the selection panel and then the selection official. It was not rejected until the selection official made his decision. In fact, the memorandum from the chairman of the selection panel to the selection official summarizes the results of the review of all the Phase II proposals and specifically states that only one offeror, California National Resource Management, Inc., not YRTSC, was considered "non-responsive."

 Moreover, even if plaintiff could point to documentation showing that a non-responsibility determination had been made, or if the plaintiff could show that it had not received the selection because of a finding of non-responsibility, the government is entitled to some deference in its decision making. The standard of review regarding the actions of a government official who has made a responsibility determination under the FAR is a difficult one for a plaintiff to meet. The court in *Hayes Intern. Corp.* offered a helpful summation of the standard:

It is well-established that the contracting official has a considerable degree of discretion in arriving at a responsibility determination. *See Keco,* 203 Ct.Cl. at 576, 492 F.2d 1200; *Trilon Educational Corp. v. United States,* 217 Ct.Cl. 266,

578 F.2d 1356 (1978). Because the criteria for determining bidder responsibility are not readily susceptible to reasoned judicial review and essentially involve a matter of business judgment, *see Trilon,* 217 Ct.Cl. at 270–271, 578 F.2d 1356, affirmative determinations of responsibility generally will not be overturned absent allegations of fraud or bad faith. *Id.; accord Keco,* 203 Ct.Cl. at 576, 492 F.2d 1200.

*Hayes International Corp. v. United States,* 7 Cl.Ct. 681, 685 (1985). Financial capability is but one of a number of factors to be considered when making a responsibility determination under the FAR and a firm with adequate financial resources may be found non-responsible if it does not meet the other criteria. Adequate financial capability, in and of itself, does not equate to meeting the responsibility requirements. 48 C.F.R. § 9.104–1 (1991).

Under the solicitation at issue in this case, even if an applicant, such as YRTSC, passes the test of responsibility under Phase I of the solicitation, as far as Phase II of the solicitation is concerned, the National Park Service can point to independent regulatory authority for its decision to consider financial capability as part of the Phase II proposal evaluation process. This authority is codified at 36 CFR § 51.4(b) (1992), which implements the CPA and reads:

The principal factors to be considered in selection of the best proposal shall be (1) the experience and related background of offerors, (2) the offeror's financial capability, and (3) conformance to the terms and conditions of the prospectus in relation to quality of service to the visitor. Secondary factors shall included franchise fee offered and other factors as may be specified.

 Plaintiff, nonetheless, continues to assert that the issue of performance capability, which it maintains can include inquiries into financial resources, experience, past performance, place of performance and integrity, are issues of contractor responsibility and should not be used as an evaluation factor. Although there has

been some debate regarding whether or not financial capability is appropriate for use as an evaluation factor, in *Delta Data Systems Corp. v. Webster*, 744 F.2d 197 (D.C.Cir.1984), now Justice Scalia wrote:

> As we have noted, however, GAO decisions support the proposition that responsibility factors may be considered in the course of proposal evaluation.... We agree with that assessment, and find no basis for excluding from its generality financial factors where they are reasonably relevant to the proposal in hand.

*Id.*, 744 F.2d at 203. Likewise, Professors Nash and Cibinic similarly indicate that responsibility related factors also can be used in the evaluation process:

> Agencies commonly use responsibility related factors in the evaluation process, notwithstanding the fact that a responsibility determination must ultimately be made.... This process does not constitute a responsibility determination, ...

John Cibinic, Jr. and Ralph C. Nash, Jr., *Formation of Government Contracts* 547 (1986).

The Phase II SOR, therefore, permissibly stated:

> Proposals for financial commitments will be closely reviewed against Balance Sheet and Income Statement projections and the Service's knowledge of the operating costs of this business. Predictable, stable, and well-run businesses consistently providing maximum service to the public in operations and facilities that are the best of their type are most consistent with the National Park Service's objectives of public service. Financial commitments which appear inconsistent with these objectives and/or which do not appear to allow the concessioner a reasonable opportunity for a profit from the operations authorized hereunder based on the capital invested are not acceptable. However, not-for-profit or non-profit proposals will be evaluated as such.

Having passed the threshold review in Phase I of the SOR, the proposal submitted by YRTSC was in fact reviewed in Phase II by the evaluation panel, the selection panel and the selection official, and was not, as plaintiff would have us believe, eliminated following an alleged finding of non-responsibility. A December 17, 1992 memorandum from Mr. John H. Davis, chairman of the selection panel asking for the concurrence of Mr. Herbert S. Cables, Jr., Deputy Director of the National Park Service, who was the individual designated to make the selection, tells the story. According to the memorandum:

> The Yosemite Concession Selection Panel was established to review these offers and select the best overall proposal received for award of the contract. The 'best proposal' is described in the prospectus as that offer which is considered most likely to effectively achieve the objectives of the National Park Service for concession services and facilities in Yosemite National Park as stated in the prospectus and related documents. In addition to conformance to the terms and conditions of the prospectus, the principal factors to be considered in the selection of the best proposal are the experience, related background and financial capability of the offeror. These principal factors are set forth in the Phase I prospectus Selection Criteria. Particularly, Phase I applicants had to demonstrate substantial competence to operate a complex, service-oriented business and demonstrate with reasonable assurance the ability to provide not less than $12 million initial equity capital. The five Parts of the additional Selection Criteria contained in the Phase II prospectus contain more specific criteria related to these principal factors (Part II and Part V Selection Criteria) and a variety of secondary criteria, including the level of the offeror's concession facility financial commitments (Selection Criterion 16), Equal Opportunity programs (Selection Criterion 9), and the offeror's understanding and commitment to the preservation and interpretation of the resources of Yosemite National Park (Part IV Selection Criteria or 'resource preservation criteria').

Following the review and evaluation of Phase II proposals, Mr. Davis recounted

how the selection panel reached its decision:

All the offers, except one considered as non-responsive, [California National Resource Management, Inc.] were determined satisfactory in regard to the principal factor of experience and related background. The results of the evaluation of financial ability and conformance to the terms and conditions of the prospectus were more varied. Several of the offers did not contain the required "compelling evidence" of the ability to provide $12 million of initial equity capital and several were conditioned on substantive changes to the proposed concession contract for the benefit of the offeror, including shifting of environmental liabilities, contrary to the terms of the prospectus. Only one offer was determined to meet all the principal selection factors. This offer is clearly the best overall offer in the opinion of the Selection Panel for the reasons discussed below.

Further, Davis added:

YRTC is a newly formed company with an experienced board of directors and management team but is not an ongoing concern. The Selection Panel considers that the offer demonstrates satisfactory experience and related background. The Selection Panel also considers that YRTC['s] offer is satisfactory with respect to Equal Opportunity and resource preservation factors. However, YRTC did not present required evidence of an ability to fulfill the stated financial requirements. The offer states that YRTC has raised only $7 million of the $12 million minimum requirement for equity capital but intends to raise the balance by award of the contract. The $7 million the offer states has been raised was accomplished by a private stock placement. The offer did not contain copies of purchase pledges for the $7 million nor does it present any evidence to the effect that it has the ability to raise the balance of the $12 million. The prospectus, in this regard requires offerors to submit specific "compelling evidence" of an ability to obtain the necessary financing. The

Selection Panel considers that YRTC does not meet the principal factor of financial capability.

YRTC proposes a CIF contribution of 2% for the first four years of the contract and 6.1% for the balance ($65.7 million total present value). However, a substantial portion of this contribution is conditioned on a sharing of profits in later years of the contract, an eventuality which is not assured.

The offer also proposes to limit YRTC's environmental mitigation liability to $12.3 million requiring indemnification from the government or MCA in this regard. The offer further assumes that implementation actions under the Concessions Services Plan or Housing Plan will be subject to negotiation with NPS, including the level of contribution to the CIF. This assumption is contrary to the terms of the prospectus and contract. Acceptance of this assumption by NPS would impact the ability of NPS to implement these plans as needed and could prove detrimental to visitor service as the effect could be to reduce contributions to the CIF and/or impede implementation of concession improvements. In any event, such assumption and limitation of liability could not be accepted, even if otherwise lawful and in the best interests of the government, without resolicitation of the concession opportunity because they constitute material changes to the terms of the solicitation for the benefit of the offeror.

YRTC is specifically rated unsatisfactory with respect to Criteria 15 and 16 as discussed further in the attached evaluation.

John Davis went on to state that the selection panel considered that, "the offer of Delaware North Companies, Inc. is the best overall offer as it is the most likely to achieve the objectives of the National Park Service for concession services and facilities in Yosemite National Park." The evaluation panel performed its assignments. It reviewed and analyzed each proposal and then compared the proposals. A comparative matrix was prepared. The statement

by Stephen Crabtree at his deposition that the evaluation panel did not have to compare the applications point by point because they had only one offer which was found "satisfactory" on all criteria does not mean that offers found "unsatisfactory" on one or more criteria were eliminated from further consideration by the evaluation panel. The following colloquy at Stephen Crabtree's deposition is instructive:

Q. [counsel for plaintiff] What is the significance of having only one that meets all the criteria?

A. Well, one that meets all the criteria is presumably better than any who don't meet some of the criteria.

Q. Okay. Did you meet any criteria, other than 15 or 16, in which Delaware North's proposal was considered better that the proposal of YRTSC?

A. That evaluation phase was never done. You wouldn't get to that phase. You would not spend the time to evaluate the specific quality of each until you reached satisfactory. Then you would evaluate all of the offers that were satisfactory against each other.

Because the evaluation panel found only one offer to be successful on all criteria, the evaluation panel felt that it could shortcut its work and reach an earlier recommendation, which could then be reviewed by the selection panel, and, then, by the NPS selection official. YRTSC was treated in exactly the same manner as all the other offerors who had submitted applications pursuant to the Phase II SOR.

The reasons why an applicant, such as YRTSC, was found "unsatisfactory" on Criteria 15 and 16 were included in the evaluation report, which discussed each of the proposals received in depth. The evaluation report was then made available to the selection panel for their review. The selection panel prepared its own report and presented it to Herbert Cables, the selection official. The selection panel "strongly" recommended that Delaware North be selected for award of the final contract. Herbert Cables, as the individual designated to make the selection, endorsed the selection panel's memo, resulting in the announcement that Delaware North had been selected. The National Park Service's evaluation of all the proposals received, including YRTSC's proposal, was carefully arrived at and documented with an evaluation memorandum of over twenty-five pages of supporting rationale on just YRTSC, as well as a twenty-three page memorandum evaluating Delaware North. Similar detailed evaluations appear to have been prepared on each of the other applications. Additionally, the selection panel's memorandum was another eight pages. The language of the evaluation memorandum is clear that the evaluation panel did not make the final decision regarding the winning contractor, but presented options to a selection panel. The selection panel did not make the final decision either, but made a recommendation to Mr. Cables, the NPS Deputy Director, who made the final decision, which was announced on December 17, 1992. Accordingly, plaintiff's claim that it was precluded from further consideration after receiving an "unsuccessful" rating from the evaluation panel on Criteria 15 and 16 is without merit. Plaintiff was considered at each stage of the review, but Delaware North was found to have submitted the "best overall offer."

Part of plaintiff's confusion as to the evaluation procedure, including plaintiff's versions of the concepts of responsibility and responsiveness, may arise, in part, from the fact that in plaintiff's briefing material submitted to this court, plaintiff appears to have used the terms "bid" and "offer" interchangeably, and apparently has ignored the distinctions between sealed bidding and negotiation. "Sealed bidding is a method of contracting which employs competitive bids, public opening of bids, and awards." 48 C.F.R. § 14.101 (1991). Professors Cibinic and Nash explain some of the distinctions between negotiation and sealed bidding as follows:

Negotiation differs significantly from sealed bidding. First, proposals are not available for public inspection prior to award. In contrast, under sealed bidding public opening of bids is a major part of the process and bids may be examined by any person at that time. Second, the

contracting officer is not required to reject proposals which vary from the RFP requirements but may consider such proposals. Thus, negotiation does not involve the concept of responsiveness developed in sealed bidding even though the term is sometimes used in negotiations, Pacificon Productions, Inc., Comp. Gen.Dec. B–196371, 80–2 CPD ¶ 58 (1980). The concept of responsiveness was developed in sealed bidding where a contracting officer is prohibited from considering a bid which deviates from the IFB. This prohibition is not applicable to negotiation where the contracting officer is permitted and encouraged to conduct oral or written discussions with offerors whose proposals vary from the RFP. Third, the negotiation process permits discussion between the parties and modifications of proposals by offerors while sealed bidding does not. Finally, under negotiation the Government's source selection officials have much greater discretion in selecting the successful offeror for award. They may "trade off" cost to the Government against other subjective factors such as technical performance or management capability in arriving at the source selection decision....

John Cibinic, Jr. and Ralph C. Nash, Jr., *Formation of Government Contracts* 523–24 (1986). Had the instant selection process been conducted as a sealed bid, which it was not, failure to comply in all material respects with the invitation for bids would have been fatal to the bidder's chances for award. 48 C.F.R. § 14.301 (1991). Therefore, if the Park Service's Phase II SOR had been a sealed bid procurement, then YRTSC's failure to be responsive to Criteria 15 or 16 would have precluded further consideration of YRTSC's proposal. In the case at bar, however, the Park Service requested proposals pursuant to rules for negotiations, not sealed bidding. Contrary to what would have happened in a sealed bid situation, plaintiff was not precluded from further consideration after the evaluation panel found YRTSC's proposal "unsuccessful" for Criteria 15 and 16.

*Plaintiff's Proposed Findings of Uncontroverted Fact 105*

*Plaintiff's 105*—YRTSC believed that lack of *binding* commitments would not preclude YRTSC from consideration and, as stated in the proposal and the accompanying proposal letter, believed that more time would be allowed to submit information.

█ Plaintiff contends that YRTSC believed that the lack of binding commitments on the date the offer was submitted should not have precluded plaintiff from consideration and selection, and that more time should have been allowed to plaintiff to submit information confirming those commitments, up to the time a contract was signed; this, plaintiff contends, represents a material fact in dispute which should preclude summary judgment.

Plaintiff argues that:

NPS's requirement of binding commitments of $12 million in equity for working capital at the time offers were submitted also conflicts with the terms of the SOR itself. The SOR contains a document *drafted by NPS* entitled: "Format for Applicant's Proposal Letter" that offerors were required to include with their offers. That document states:

We also agree to provide the National Park Service *within thirty days of the presentation of the final Concession Contract* binding commitments for the financing proposed by our offer and agree to make the required $12 million initial capital investment in the NEW CONCESSIONER as of its formation. [Emphasis in original.]

Defendant, however, contends that plaintiff's showing of financial capability for a minimum of $12 million in equity for working capital was to be included in the proposal on the date the application was submitted, so that the offer could be evaluated individually and collectively. According to the defendant, the SOR clearly stated that NPS intended to select the concessioner without further submittals, and that NPS, therefore, was under no duty to seek additional information.

The court finds, however, that whether or not YRTSC should have been allowed more time to present its financial information can be resolved by the court by a plain reading of the SOR Phase II language, and is not a question of fact. The relevant paragraphs read:

5. The APPLICANT will provide a minimum of $12 million as initial equity for working capital. That amount is intended to include the amount reimburseable to NPF as described at page 9 of BUSINESS OPPORTUNITY, *Purchase of Existing Assets and Business.* This must appear on the books of the New Concessioner as equity, not debt. *Make sure that these commitments are reflected in the financial information provided.* Describe the source of and terms for these funds.

6. *Identify the source of any financing* needed. *Document the availability of financing with financial statements, financing agreements and letters of intent from lenders. Present compelling evidence of proposers ability to obtain the necessary financing. Be specific. Identify all sources.*

*Describe the financial terms* of each proposed financing source. *Explain* the financial arrangements you propose to use to finance any acquisition debt and to provide working capital.

*If funds are to be raised from individuals,* the APPLICANT *must submit* sufficient documentation to demonstrate, in a compelling way, *the availability and commitment of such funds.*

 \* \* \* \* \* \*

7. The APPLICANT selected by NPS to be awarded the CONTRACT may, *subsequently,* propose for NPS consideration *modifications to* its financing arrangements if they are at least as favorable to NPS as those presented in the offer. *NPS, however, is not obligated to accept such modifications.* Modifications in financial terms approved by NPS, including but not limited to modifications to the MCA financing arrangement, if applicable, will not be considered a material amendment to the terms and conditions of this SOR or the CONTRACT.

(Emphasis added.) The language of these paragraphs of the Phase II SOR clearly requires that an applicant submit its best presentation of the requested information at the time an application was sent to NPS. In fact, paragraph 7 states that a modification to the financial proposal submitted may be proposed for NPS consideration, but that NPS is not obligated to accept such modifications.

The Phase II SOR is clear that all applicants were asked to submit compelling evidence of the source availability of financial commitments along with their proposals for evaluation purposes. As stated in the solicitation "Make sure that these commitments [for the minimum of $12 million] are reflected in the financial information provided." It would have been impossible for the NPS evaluators to compare the applications received should some applicants have chosen to turn in financial information with their applications and others have chosen not to do so. Surely such cannot have been the intent of the words of the Phase II SOR. The plain instruction of the Phase II SOR was to require submission of evidence of financial information with the application when it was tendered to the NPS. Additionally, 36 C.F.R. § 51.4(b) (1992), the concession regulations, state that "the principal factors to be considered in selection of the best proposal shall be ... (2) the offeror's financial capability."

Although plaintiff maintains that it could have raised $12 million in equity capital at the time the proposal was submitted, only $7,035,000 were documented in YRTSC's application. The Phase II proposal submitted by plaintiff states: "YRT Services Corporation will raise $12 million through a private placement of convertible preferred stock. Of this amount, commitments in the amount of $7 million have been received since efforts were initiated, ..." In addition, in the cover letter submitted with plaintiff's Phase II proposal, and dated November 16, 1992, plaintiff states, "we *anticipate* receiving additional commitments of $5.0 million before contractor selection...." (Emphasis added.)

Plaintiff also places reliance on the proposed "Format for Applicant's Proposal Letter," attached to the Phase II SOR, which states "[w]e also agree to provide the National Park Service within thirty days of the presentation of the final Concession Contract binding commitments for the financing proposed by our offer and agree to make the $12 million initial capital investment in the NEW concessioner as of its formation." Plaintiff argues that the language of this document allowed applicants thirty days following presentation of the Concession Contract to the winner to provide its binding $12 million commitments to the NPS. There is, however, a difference between the need to provide the actual binding commitment documents for the $12 million to the NPS, together with making the initial $12 million investment in the new concessioner, as compared to the Phase II SOR requirement to present "compelling evidence" of the $12 million as available so that all the applications can be compared to each other. Plaintiff, YRTSC, in fact, only presented "compelling evidence" of just over $7 million of available equity for working capital.

In addition, plaintiff tries to construct an argument based on its subjective belief that it was not required to submit all its financial information prior to award, but that it would have more time to submit financial information up to the time of award. Plaintiff relies on deposition testimony, given after the lawsuit was filed, of Mr. Richard Martyr, a board member of YRTSC. He testified that YRTSC was "not aware of requirements of proof for the $12 million, at least what specific documents the Park Service would require," that YRTSC "didn't know if the commitment letters themselves would be sufficient, that the Park Service may need something else" and that YRTSC was "prepared to provide any of that information [financial] should the Park Service require it." Likewise, Mr. Green, Executive Director of YRTSC, stated following initiation of the lawsuit, that YRTSC did not believe that the lack of binding commitments would preclude YRTSC from consideration and believed that more time would be allowed to submit information. YRTSC's beliefs, however, are not material and do not rise to the level of a material fact in dispute to preclude defendant's motion for summary judgment. The language of the Phase II SOR is controlling in this situation. Moreover, plaintiff has pointed to nothing in the record which was written or said by a NPS official to mislead or alter the words of the Phase II SOR.

Plaintiff's underlying contention that NPS ceased to consider YRTSC's proposal further, after binding commitments for the $12 million were found to be missing, is also incorrect. As discussed previously, YRTSC was considered for an award up to the point Herbert Cables, the NPS Deputy Director, reviewed the selection panel's memorandum and concurred in the selection of Delaware North. Despite the evaluation panel's early recognition that "we had only one company that was satisfactory," as documented in the deposition of Stephen Crabtree, the evaluation panel chairman, YRTSC was not precluded from further consideration following the panel's recognition that plaintiff had failed to establish its ability to raise a minimum of $12 million, as required. To the contrary, the selection panel reviewed the work of the evaluation panel, including its analysis of the proposal submitted by YRTSC, and then sent a recommendation to Herbert Cables, the Deputy Director of the Park Service, who as the selection official also reviewed the recommendation and made the selection.

Moreover, there are clear indications in the record that YRTSC management understood it would have to document funding commitments, at a minimum, of $12 million at the time the Phase II proposal was submitted to NPS on November 16, 1992, even though, arguably, the paperwork reflecting the binding commitments had to be presented to the Park Service within thirty days of the presentation of the final concession contract and the $12 million initial capital investment had to be made in the new concessioner as of its formation. A letter from managing director, Bernard L. Butcher, a member of the YRTSC Board of

Directors, soliciting funds, included the following revealing language: "... Our bid for the contract must be in by mid-November, accompanied by funding commitments totaling $12 million.... A commitment is needed now but funding would take place only *if and when* we win the contract which will be well into 1993. In other words ... would only be supporting us if we are able to beat the competition on our own merits and be chosen by the Park Service...." Likewise, in the "YRT Services Corporation's Private Placement Memorandum," dated September 24, 1992, sent to prospective potential investors, the following words appear:

VIII. FINANCIAL PLAN

The Park Service has indicated that a prospective bidder for the Contract must demonstrate financial commitments of at least $12 million, and through realistic financial projections show that an appropriate return can be generated on this level of commitment. The $12 million figure is an estimate by the Park Service (concurred in by YRTSC) of the working capital needed to operate this business, with a reasonable margin for safety.

*Plaintiff's Proposed Findings of Uncontroverted Fact 114*

*Plaintiff's 114*—The commitments for the $12 million in equity for working capital are as follows:

| | |
|---|---|
| ... [Investor 1] | $4,000,000 |
| ... [Investor 2] | $ 500,000 |
| ... [Investor 3] | $1,500,000 |
| ... [Investor 4] | $1,000,000 |
| ... [Investor 5] | $3,000,000 |
| ... [Investor 6] | $1,000,000 |
| ... [Investor 7] | $1,000,000 |

Any doubts about availability of working capital could have been resolved through a request for clarification.

■ Plaintiff contends that any doubts about the availability of its $12 million in working capital could have been resolved through a request by NPS to YRTSC for clarification. Moreover, plaintiff asserts in "Plaintiff's Motion for Summary Judgment

and Memorandum in Support," that it "has obtained commitments for the $12 million *since the bid opening.*" (Emphasis added.) Allowing itself a little license in language, however, plaintiff, in its proposed findings of uncontroverted fact 114, submitted to the court on February 25, 1993, well after the November 16, 1992 submission application date, states, "the commitments for the $12 million in equity for working capital *are* as follows: ..." (Emphasis added.) As evidence of these commitments, the plaintiff points to the separate letters from each potential investor. In fact, plaintiff's commitment letters appear to have been received by YRTSC *after* the proposal was submitted and, indeed, *after* the selection by NPS of Delaware North Corporation. Moreover, in the letters cited, several of plaintiff's investors, even well after the applications had been submitted, indicated that the funds were not "committed" in the amounts claimed by plaintiff, but had been seriously conditioned on future approvals and events. For example, BankAmerica's letter stated their "commitment to purchase up to *$2,500,000* of the Preferred Stock ... we will *consider* increasing the level of commitment to a total of $3,000,000 if needed ... subject to BankAmerica Capital Investment Incorporated Board of Directors approval." (Emphasis added.) Likewise, the letter from another investor stated that to increase its commitment from $500,000 to $1,000,000 *would require* "*approval by the committee* ... subject to full board approval at its next meeting." (Emphasis added.)

By contrast, Delaware North, the company selected to receive the award, presented the NPS with a commitment for the $12 million equity contribution for working capital as of the date of the application, as well as assurances for additional financial commitments. The Delaware North proposal in response to the requirement for the $12 million financial commitment reads:

The financial commitment that DNC is prepared to make to the National Parks

Service for Yosemite National Park is indeed significant. In addition to the $12 million equity contribution for working capital, DNC has agreed to take on the liability of the National Parks Foundation's note to MCA. Further, DNC is prepared to commit five percent of gross receipts to the Capital Improvement Fund and to make the required payments to the Government Improvement Account. When combined with the projected environmental remediation costs required during this period, additional services to be performed by the concessioner that were previously performed by the NPS, and capital expenditures not covered under the CIF, DNC's financial proposal is indeed substantial.

In order to ensure that a prudent and thorough assessment has been made of the financial implications of the Yosemite operation, DNC has engaged the assistance of leading experts in various fields. In addition to its own highly trained in-house financial and auditing groups which have performed the due diligence, DNC has retained its outside auditors, Price–Waterhouse, to review and test its financial assumptions; ERM–West, Inc., to review existing and future environmental liabilities and to establish an ongoing remediation program; Pannell Kerr Forster to review hotel operations; and the Gallup Organization in order to help assess current and future customer wants and needs.

Regardless of the information plaintiff included in its Phase II application submission and the choices plaintiff made when it assembled its application, plaintiff, nonetheless, contends that any question regarding the amount of equity capital available could have been resolved through a clarification. Plaintiff cites to 48 C.F.R. § 15.601 (1991) to help define the concept of clarification as a means of "communication with an offeror for the sole purpose of eliminat-

ing minor irregularities, informalities, or apparent clerical mistakes in the proposal." [25] The regulations applicable to concession contracts state: "The Director *may* solicit from any applicant additional information or written or verbal clarification of a proposal." 36 C.F.R. § 51.4(c) (1992). (Emphasis added.) The court, however, finds that YRTSC's proposal was not in the least ambiguous, rather, the minimum $12 million dollars in equity capitalization simply was not documented by plaintiff in its submission. Consequently, the NPS could not have resolved anything by asking for a clarification. Plaintiff's application clearly stated, as shown above, that YRTSC had commitments of just over $7 million, but anticipated raising the additional capital at a later date, subject to conditions by certain of its investors that additional funds still would require approval from their Boards of Directors. Thus, it is clear that YRTSC did not have commitments for the initial $12 million in equity capital, and apparently did not see the absence of the commitments as a problem, despite the clear language of the Phase II SOR to document, by "compelling evidence," the proposer's ability to raise a minimum of $12 million. Moreover, in their proposal plaintiff described the timing as follows:

> Commitment, contingent on award of contract to YRTSC and successful placement of the Minimum Amount, are due by contract award, expected in January 1993. Funding to occur in August 1993.

In other words, plaintiff's proposal puts the financial cart before the horse. By making commitments for the $12 million contingent on award of the contract, plaintiff admits that it might not even have full funding available before award, or even at the time of award. Indeed, plaintiff even intended that funding would be obtained in August, 1993, seven months after the anticipated award date.

---

25. As discussed previously, although the FAR does not apply automatically to concession contracts, 48 C.F.R. § 15.601 (1991) can serve as guidance regarding a generally accepted definition of "clarification," since none is included in the regulations applicable to concession contracts. 36 C.F.R. §§ 51.1 to 51.7 (1992). Also see more in depth discussion of clarification starting on page 413, below.

It is highly questionable that plaintiff could have "resolved" a matter such as documenting roughly $5 million in missing financial commitments through a clarification. In order to resolve plaintiff's application defect, NPS would have had to permit YRTSC to *change* its offer, by removing the language making funding commitments contingent on the award of a contract and would have had to allow YRTSC to solicit changes in the qualified commitments from its financial backers to eliminate the contingent nature of their commitments. The SOR is clear that the proposal submitted should reflect the whole proposal made by an applicant. Moreover, the Park Service emphasized that it anticipated selecting a concessioner from the proposals made "without further submittals or presentations."

Plaintiff's staggered submission approach would place the government in the position of not knowing whether or not an applicant would be minimally funded to the full $12 million amount until just before the contract period was to begin. Since at the time of the evaluation plaintiff did not have commitments in the amount of the $12 million, and considering the contingent nature of plaintiff's ability to obtain additional commitments, the court finds the government's decision to rate plaintiff "unsuccessful" with respect to the $12 million working capital requirement, not only reasonable, but not in the slightest arbitrary or capricious. Moreover, YRTSC's proposal was compared to the other applications submitted, which could demonstrate the availability of the $12 million at the time the applications were submitted, and found not to be the best overall proposal, or the proposal "most likely to effectively achieve the objectives of National Park Service for Concession Services and facilities in Yosemite National Park as stated in the prospectus and related documents."

**26.** Defendant's proposed finding of uncontroverted facts number 29 contained the following footnote:

The one exception to the unlimited nature of the new concessioner's liability for environ-

### LIMITATION OF LIABILITY FOR ENVIRONMENTAL FACTORS

*Defendant's Proposed Findings of Uncontroverted Facts 29*

*and Plaintiff's Proposed Findings of Uncontroverted Fact 118*

*Defendant's 29*—The SOR required that the new concessioner accept virtually unlimited liability for environmental remediation.[26]

*Plaintiff's 118*—NPS believed such a limitation [on environmental remediation] violated the SOR terms. The unsuccessful rating due to the limitation of liability precluded further consideration of YRTSC's offer and precluded YRTSC's selection as the new concessioner. Clearly, NPS treated the limit on liability as a responsiveness issue.

In its application, YRTSC placed a limit on its liability for the costs of environmental remediation at $12.3 million, presumably, as a result of which, any additional costs were to be absorbed by the government. Consequently, NPS determined that YRTSC's offer should be rated "unsuccessful" on criterion 16. Much like plaintiff's argument on the $12 million equity capital issue, plaintiff argues that the NPS treated plaintiff as non-responsive because of its position on environmental liability, giving YRTSC the subsequent "unsuccessful" rating, and, therefore, failing to evaluate YRTSC's proposal further.

Plaintiff asserts that defendant's proposed findings of uncontroverted fact number 29, which states "the SOR required that the new concessioner accept virtually unlimited liability for environmental remediation," presents the court with material questions of fact, which is disputed by the parties and, therefore, must be resolved at trial. Plaintiff states in its motion for summary judgment and memorandum in support that "NPS's belief that the SOR does not allow a limitation on liability is unfounded. . . . the Merger Agreement does

mental remediation is that YP & C Co. and MCA, its parent company, accepted liability to the extent of $200,000 for one identified Superfund site, the Purity Oil site.

not preclude a limit on liability, it says only that MCA will not be liable for costs of environmental remediation." Plaintiff admits that YRTSC's proposal refuses to accept unlimited liability for the costs of environmental remediation. Plaintiff argues, however, that its proposal does not require a particular party to accept the liability for the costs of remediation beyond those plaintiff will agree to accept. Also, plaintiff asserts that "the limit, was, as a practical matter not detrimental to the NPS." In sum, plaintiff argues that because the requirement not to have an environmental liability cap is a disputed fact, defendant's motion for summary judgment should be defeated.

In order to understand the NPS requirements for environmental liability, a number of documents must be read together: the SOR, the proposed concession contract, a sample of which was included in the SOR, and the merger agreement,[27] both of which the new concessioner was expected to sign. The SOR clearly states that:

> Modifications are not favored by NPS and proposals may not be conditioned on acceptance by NPS of substantive modification to the CONTRACT. However, NPS may chose to accept revisions to the CONTRACT where necessary to effectuate implementation of a favorable proposal. In addition, specific provisions of the CONTRACT are subject to revision by the NPS as appropriate, ...
>
> ... NPF has entered into an Agreement and Plan of Merger (provided with this SOR) dated September 20, 1991 ("Merger Agreement") under which NPF is to acquire YP & CCo. on September 29, 1993. NPF, however, will assign the Merger Agreement without cost to the Applicant selected by NPS to be awarded the CONTRACT....
>
> As a condition of the award of the CONTRACT, the selected Applicant must agree to accept such assignment without conditions and carry out the terms and conditions of the Merger Agreement in place of NPF. The execution of the as-

signment will occur at an appropriate time to be determined by NPS in the process of award, execution and implementation of the CONTRACT.

> Offers which seek to modify the Merger Agreement are not acceptable.

The SOR specifically references the terms of the proposed contract. The contract contains a section by which the Concessioner agrees to indemnify the United States for a broad spectrum of potential liabilities, including environmental liability:

> SEC. 16. INSURANCE AND INDEMNITY
>
> (a)(1) The Concessioner shall save, hold harmless, defend and indemnify the United States of America, its agents and employees for losses, damages or judgments and expenses on account of fire or other peril, bodily injury, death or property damage, or claims for bodily injury, death or property damage of any nature whatsoever, and by whomsoever made, arising out of the activities of the Concessioner, his employees, subcontractors or agents under the contract.
>
> \* \* \* \* \* \*
>
> (a)(4) The Secretary will not be responsible for any omissions or inadequacies of insurance coverages and amounts in the event the insurance purchased by the concessioner proves to be inadequate or otherwise insufficient for any reason whatsoever.

The Phase II SOR also incorporates all the terms of the merger agreement, which by reference contains several sections indicating that the new concessioner, referred to in the merger agreement as the "surviving corporation," agrees to indemnify the previous concessioner from any and all covered liabilities:

> Section 6.02. Indemnification by the Surviving Corporation.
>
> (a) From and after the Closing, the Surviving Corporation shall indemnify and hold harmless MCA, its affiliates, each of their respective directors, officers, employees and agents, and each of

---

**27.** The agreement and the plan of merger enables the National Park Foundation to obtain the assets of the current concessioner, and, in turn, facilitates the transfer of these assets to the new concessioner.

the heirs, executors, successors and assigns of any of the foregoing collectively, the *'Indemnified Parties'* from and against any and all Covered Liabilities (other than Taxes ...).....

The merger agreement then defines the "covered liabilities" to include:

[t]he term *'Covered Liabilities'* shall mean any and all debts, losses, liabilities, claims, damages, obligations, payments (including, without limitation, those arising out of any demand, offset, defense, counterclaim, assessment, settlement, judgment or compromise relating to any Action), costs and expenses (including, without limitation, any attorneys' fees and any and all expenses whatsoever incurred in investigating, preparing or defending any Action) and penalties, mature or unmatured, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, known or unknown, including without limitation any of the foregoing arising under, out of or in connection with any Action, order or consent decree of any governmental entity or award of any arbitrator of any kind, or any law, rule, regulation, contract, commitment or undertaking; and the term *'Action'* shall mean any actual or threatened action, suit, arbitration, inquiry, proceeding or investigation by or before any court, governmental or other regulatory or administrative agency or commission.

During the pre-selection phases of the concession contract at issue, the Park Service has taken a consistent position. Not only were the solicitation and contract documents used by the NPS clear, but in response to a question raised about the Yosemite concession contract, the Park Service responded:

41. To what extent is the concessioner liable for ground contamination, particularly pre-existing conditions? Will the NPS provide any indemnification from pre-existing conditions?

NPS The concessioner will be fully liable for ground contamination from its current and past operations. The NPS

will provide no indemnification from pre-existing conditions. See question 35.

As discussed above, by analogy to the rules of contract interpretation, the terms set forth in these documents are available for the court to read. In the instant case, the words of the SOR, the proposed contract and merger agreement are clear and should be accepted at face value. No testimony which might be developed at trial is necessary to understand those documents. The fully developed record establishes, as a matter of law, that the Phase II SOR and the additional documents required applicants to accept unlimited environmental liability.

The record in this case also establishes that the plaintiff was aware when it submitted its application that the Phase II SOR required acceptance of full environmental liability, and costs of remediation. In its private placement memorandum sent by YRTSC to potential investors, plaintiff stated:

In addition to the relocation of concessioner housing, administrative, and support facilities, the Contract introduces other conditions that serve to increase the costs of operations, alter revenue assumptions, and add uncertainty to the financial results. These include requirements to:

\* \* \* \* \* \*

● accept responsibility for all future environmental cleanup costs related to facilities of the current concessioner, both inside and outside of the Park;
● accept responsibility for all other liabilities of the current concessioner, including insurance claims filed in the future against the current concessioner;

Despite the language of the Phase II SOR and associated documents, and despite YRTSC's understanding of the requirements for environmental remediation, the government intended to impose on the next concessioner, plaintiff knowingly chose to condition its application in contravention to the operating plan and the rules laid out by NPS. YRTSC's offer stated:

The only reservation we have on conducting operations according to the operating plan concerns setting a limit on YRTSC

liability for environmental clean-up costs of prior concession operations.... The Park Service and/or MCA shall indemnify YRTSC against any annual environmental clean-up expenditures over and above the budgeted amount plus the balance in the sinking fund.

Also in a memorandum to the YRTSC Board, Bernard Butcher wrote:

Do we play completely by the rules laid out by the NPS? ... Or do we feel that winning on this basis would be a hollow victory because of the tight cash flows? If so, then we bid the conditions we think make sense, *even though we know it's a lost cause if any other responsible bidder comes closer to NPS criteria.* [Emphasis added.]

In fact, Mr. Butcher's worst fears were realized. Another bidder, Delaware North, submitted an application which fully meets both criteria 15 and 16, the two criteria on which plaintiff was found unsuccessful. Consequently, Delaware North was selected as the future concessioner, having submitted the best overall offer. Plaintiff YRTSC must bear the consequences of its own, conscious decision to deviate from the announced criteria for selection set out by the NPS.

The evaluation panel and the selection panel both commented on YRTSC's proposal which included its conditional assumption of environmental liability if plaintiff was awarded the contract. The evaluation panel wrote:

* * * We noted, however, that this proposer limited its environmental remediation liability to $12.3 million. Any cost above this amount would, therefore, presumably be absorbed by the government.

Rating: Unsatisfactory

The selection memorandum from John H. Davis, chairman of the selection panel, to the selecting official, Herbert Cables, stated:

The offer also proposes to limit YRTC's environmental mitigation liability to $12.3 million requiring indemnification from the government or MCA in this regard.

Plaintiff contends that the "unsuccessful" rating it received on the evaluation regarding its unwillingness to accept unlimited environmental liability resulted in the failure by NPS to further consider plaintiff's offer. As with the requirement to demonstrate binding commitments of a minimum of $12 million in equity capital, plaintiff contends that once YRTSC received an "unsuccessful" rating on the environmental liability issue, NPS ended its evaluation of plaintiff's application. In the first place, as demonstrated above, the language of the documents in the record, the SOR, the contract and the merger agreement, are clear on their face that the applicants were not to condition their potential environmental liability. Second, also as discussed above in connection with the $12 million financial commitment, the record clearly demonstrates that YRTSC's proposal was fully evaluated by the evaluation panel, the selection panel, and the selection official on all of the required criteria.

*Defendant's Proposed Findings of Uncontroverted Facts 34*

*Defendant's 34*—Delaware North accepted without qualification the terms of the SOR, contract, and Merger Agreement imposing virtually unlimited liability for environmental remediation. Further, Delaware North did not seek indemnification for any portion of such expenses from the NPS, MCA, or YP & C Co.

■ Plaintiff asserts that defendant's contention that Delaware North accepted, without qualification, the terms of the SOR, contract and merger agreement, including assumption of virtually unlimited liability for environmental remediation without seeking indemnification from the NPS, MCA or YP & C, constitutes a material issue of fact in dispute, which should preclude summary judgment. However, the record is clear that, unlike YRTSC, Delaware North accepted NPS's operating plan without placing restrictions on its own environmental liability. Indeed Delaware North, in Part III of its application titled "Plan for Operation" explicitly stated that it intended to operate under the current plan:

We intend to operate under the current operating plan and address issues or propose changes as they arise. The forum

for addressing those changes will be the institutionalized channels like the annual review and proposed semi-annual meetings with the NPS and Advisory Board.

In its evaluation memo of the Delaware North plan, the NPS evaluation panel stated that:

[t]his proposer indicated a willingness to assume whatever costs were necessary for environmental remediation, and estimated the costs to total $16.9 million.

Finally, in a memorandum dated December 17, 1992, the Chairman of the Selection Panel for the Yosemite Concession Contract noted with respect to the Delaware North Plan:

The company [Delaware North] places no conditions on acceptance of the stated terms of the prospectus and contract and budgets $16.9 million (*but imposes no cap on this or other liabilities*) to cover environmental mitigation expenses (from its general resources or revenues, not from the CIF). [Emphasis added.]

The record reflects Delaware North's unqualified acceptance of the terms of the Phase II SOR, the contract, including for environmental remediation, and the Agreement & Plan of Merger, nor is there any information, document or deposition testimony presented in the record, or cited to by the plaintiff, to controvert Delaware North's unqualified acceptance. In light of the strong evidence in the record showing acceptance by Delaware North of the environmental conditions imposed, the burden rests on the plaintiff to show some evidence to establish the existence of a material fact in dispute. *Celotex Corp. v. Catrett*, 477 U.S. at 325–26, 106 S.Ct. at 2553–54. In fact, there appears to be an absence of evidence to support plaintiff's case in this regard. Thus, plaintiff has failed to demonstrate a material fact in dispute in this regard, and summary judgment for defendant is appropriate in this case.

*COMPLIANCE WITH THE CONCESSION SERVICES PLAN AND HOUSING PLAN:*

### CAPITAL IMPROVEMENT FUND (CIF) FEE

*Defendant's Proposed Findings of Uncontroverted Facts 37 and 39*

*Plaintiff's Proposed Findings of Uncontroverted Fact 131, 132, 133 and 135*

*Defendant's 37*—Delaware North's application placed no restriction on compliance with the CSP, Housing Plan, or any other NPS plan for the park.

*Defendant's 39*—In materials distributed to potential applicants, including YRTSC, the NPS stated that the Park Service had no "right" number in mind for the level of the concessioner's contribution to the CIF, but felt that it would be above 5 percent. The NPS emphasized:

We are not picking a banker. We want a good solid financial package.... We may trade a little money off for a better relationship. We are taking the offer as a whole.

*Plaintiff's 131*—NPS viewed this assumption [defendant's proposed findings of uncontroverted facts 130: that costs associated with the Concession Services Plan and Housing Plan could lead to reconsideration of the CIF fee] as contrary to terms of the SOR.

*Plaintiff's 132*—Because of this, NPS gave YRTSC an unsuccessful rating.

*Plaintiff's 133*—NPS believed that such an assumption was contrary to terms of SOR. This unsuccessful rating precluded further consideration of YRTSC's offer and precluded YRTSC's selection as the new concessioner. Clearly this constitutes treatment of the matter as a responsiveness issue.

*Plaintiff's 135*—NPS witnesses recognized that operating costs associated with the Concession Services Plan and the Housing Plan are considered in setting the CIF fee.

The Capital Improvement Fund (CIF) is a unique concept which is described in the Phase II SOR as follows:

*Capital Improvement Program*

The changes to be made in the concession facilities in Yosemite are expected to extend over the 15 year term of the CONTRACT. The major costs will be financed from a Capital Improve Fund. The Concession Services Plan and the Housing Plan, when complete, will provide the primary guidelines for expendi-

tures from the Capital Improvement Fund. The new concessioner's proposed Capital Improvement Fund contribution will be an important selection factor. Improvements made from the Capital Improvement Fund will not be eligible for possessory interest compensation.

All capital needs identified in the Concession Service Plan and in the Housing Plan may not be able to be funded within 15 years from the Capital Improvement Fund and Government Improvement Account described in the CONTRACT. The Service intends to come as close to this goal as possible through the offer process that is the subject of this Statement of Requirements.

As part of Criteria 15 and 16 in the Phase II SOR, applicants were required to address their proposed CIF contribution:

What is the Capital Improvement Fund percent you propose? Express this fee as a percent of gross receipts. Show it by year and/or by levels of gross receipts. APPLICANTS should feel free to structure this in a way appropriate to their needs while also giving consideration to NPS goals for the CIF. While APPLICANTS are free to make whatever proposals they may feel appropriate, the Service, in its internal analysis, has determined that a CIF proposal of less than five percent (5%) is likely to be considered insufficient.

■■■ Plaintiff alleges that the determination by NPS that YRTSC had conditioned its offer on the assumption that changes in the Concession Services Plan and Housing Plan must lead to renegotiation of the CIF fee is contrary to terms of the Phase II SOR. Plaintiff maintains that the "unsuccessful" rating it, therefore, received was treated by NPS as a responsiveness issue, precluding further consideration of YRTSC's offer, as well as making it impossible for YRTSC to be selected as the new concessioner.

Plaintiff argues that defendant's contention that Delaware North's application placed no restrictions on compliance with the CSP and Housing Plan or with any other NPS plan for the Park is a material issue of fact in dispute. Delaware North,

however, specifically agreed in its application to operate under the current plan. Delaware North's application stated:

The SOR provides that the implementation of the revised General Management Plan, Housing Plan, or Concession Services Plan [CSP] in the future may affect the operations of the concessioner during the term of the Concession Contract. The scope and financial impact of such changes are not yet known and the NPS has directed in the SOR that applicants not take any such potential changes into account.

Accordingly, DNC management has *assumed*, for purposes of these projected financial statements, that no such changes will occur during the term of the Concession Contract and that *should they occur, appropriate adjustments will be made* to allow the Company to attain a reasonable return on its investment. [Emphasis added.]

In contrast, the YRTSC proposal reads:

As requested by the NPS, we have included our most recent version of these [revenues and expenses] projections in exhibits V.1, V.2, and V.3. These projections assume no changes in operations due to the implementation of the Concession Services Plan or the Housing Plan, for which a specific timetable was not provided. *It is understood* that any change in operations introduced by implementing actions under the CSP or Housing Plan *will be subject to negotiation* with the Park Service, including the level of contribution to the CIF. [Emphasis added.]

While at first reading it might appear that the language of these two passages is similar, upon further inspection, it is apparent that there is a significant difference between the two. Delaware North expressed some qualified concern about possible changes to the NPS plans in the future, and "assumed" that no changes would occur, but if they did occur, without obligating NPS management to make any changes, projected that "appropriate adjustments" will be made to assure a reasonable return on investment. Delaware North assumed the risk and did not condition its offer on appropriate adjustments

being made. In fact, the words included in Delaware North's proposal demonstrate that it was clearly aware that no changes to concession operations were to be assumed. In its proposal, YRTSC also assumed no changes would be made to the NPS plans. However, in contrast to Delaware North, YRTSC refused to accept the risk and insisted that "[i]t is understood that any change in operations ... will be subject to negotiations ..." In sum, YRTSC conditioned its offer on future negotiations, while Delaware North merely stated its underlying assumption and resultant expectation, without insisting that the change must occur.

YRTSC's application further addressed the CIF requirement with the following words:

Our contributions to Yosemite will take three forms. The first will be the Capital Improvement Fund. We believe strongly that one of our primary responsibilities as the concessioner is to make a substantial contribution to the Capital Improvement Fund. Though necessarily small in the earliest years, it will increase considerably during the first four to six years. A well-funded CIF will be critical to meeting our goal of assisting the Park Service in revitalizing the park.

Our second contribution to Yosemite will be voluntary donations, amounting to 50% of annual profits after tax and preferred dividends, and subject to YRTSC having generated a positive cumulative net free cash flow, beginning in 1994. The purpose of the voluntary contributions is to enable YRTSC to provide the maximum amount to the park without placing undue risk upon our investors. If the business is successful, which is our intention, then the park will benefit directly from this success. In other words, the more profitable and better run we are, the more money there is for the park. Remaining profits not needed to service preferred stock will remain in the company to build its capital base.

*A third, contingent, contribution to the CIF will be from a portion of the funds reserved for environmental clean-up that exceed our actual expenditures.* Amounts not actually spent for environmental clean-up, below 75% of budgeted amounts, will be placed in a segregated sinking fund account. The Park Service and/or MCA shall indemnify YRTSC against any annual clean-up expenditures over and above the budgeted amount for that year plus the balance in the sinking fund. The Park Service may at any time request that the sinking fund balance be transferred as a supplementary contribution to the CIF. [Emphasis added.]

We commit to the following base annual CIF contributions:

TABLE V.1. CAPITAL IMPROVEMENT FUND CONTRIBUTION

| Year | Capital Improvement Fund (as a Percentage of Revenues) |
|---|---|
| 1994 | 1.0% |
| 1995 | 1.5% |
| 1996 | 2.5% |
| 1997 | 3.2% |
| 1998 | 4.3% |
| 1999 | 5.1% |
| 2000 | 6.1% |
| 2001 | 6.1% |
| 2001–2008 | 6.8% |
| Weighted Average | 5.4% |

Using our conservative projections as shown in Exhibits V.1 and V.2, we estimate that we will contribute a total of $103,327,000 to the Capital Improvement Fund over the life of the contract.

Both the evaluation panel memorandum and the selection criteria memorandum to the selection official address the conditions in YRTSC's application, which NPS officials termed unsatisfactory conditions. The evaluation memorandum states:

> YRT's 'assumption' that plan implementation and contributions be renegotiated for any change in operations occasioned by implementation of each component of the Concession Services Plan or the Housing Plan is not an acceptable condition. [Emphasis added.]

\* \* \* \* \* \*

We conclude that the present value of the proposer's contribution to the CIF would be approximately $65.7 million over the life of the contract. This translates to an average percentage of 6.1% of the present value of gross receipts.

\* \* \* \* \* \*

Considering only the first four years of the contract (recognizing that NPS will renegotiate the CIF percentage), the proposer's offer was $7.0 million. This translates to an average percentage of 2.0% of the present value of gross receipts.

The memo to the selection official reads:

> YRTC proposes a CIF contribution of 2% for the first four years of the contract and 6.1% for the balance ($65.7 million total present value). However, a substantial portion of this contribution is conditioned on a sharing of profits in later years of the contract, an eventuality which is not assured. [Emphasis added.]

The selection panel memo from John Davis to Herbert Cables, the selecting official, states:

> The offer further assumes that implementation actions under the Concessions Services Plan or Housing Plan will be subject to negotiation with NPS, including the level of contribution to the CIF. This assumption is contrary to the terms of the prospectus and contract. Acceptance of this assumption by NPS would impact the ability of NPS to implement these plans as needed and could prove detrimental to visitor service as the effect could be to reduce contributions to the CIF and/or impede implementation of concession improvements. In any event, such assumption and limitation of liability could not be accepted, even if otherwise lawful and in the best interests of the government, without resolicitation of the concession opportunity because they constitute material changes to the terms of the solicitation for the benefit of the offeror.

Despite the NPS admonitions to prospective applicants, included in the Phase II SOR, plaintiff conditioned its CIF proposal on negotiation should NPS change the CSP or Housing Plan. Also, unfortunately for plaintiff, Delaware North did not condition its offer regarding CIF and, thus, in comparison to plaintiff's offer, was considered to have submitted the better application. The words of the Phase II solicitation are unambiguous. Once again, by analogy to the standard rules of contract interpretation, if the words of the document are clear on their face, no further evidence is necessary, and the document is subject to interpretation by the court as a matter of law.

Moreover, the Phase II SOR is extremely clear. "Proposals of expansion, deletions, or other similar suggestions not in accordance with service planning documents or of facilities of a type not requested will not be considered better proposals." Applicants were also informed in the Phase II SOR that modifications were not favored. Consequently, plaintiff, YRTSC, as in the case of the limitation it tried to place on its environmental liability, was once again assuming a risk when it conditioned its proposal on appropriate adjustments to either the CSP plan, Housing plan or CIF fee.

YRTSC also tries to allege that the NPS viewed plaintiff's assumption that "costs associated with the Concession Services Plan and Housing Plan could lead to reconsideration of the CIF as contrary to the SOR," even though, according to plaintiff, certain NPS witnesses recognized the concept. Plaintiff has missed the issue. The dispute is not whether the costs associated with the CSP and Housing Plan could be factored into calculation of the CIF, and could lead to reconsideration. Rather, the difficulty with plaintiff's proposal is that YRTSC conditioned the terms of its CIF proposal on negotiation if any change in operations occurred, and also conditioned its CIF contribution on profits in future years.[28] NPS apparently viewed the condition that negotiation of various management plans with plaintiff must follow as an unacceptable encroachment on NPS management discretion, given its mission in the national parks. Therefore, the proposal submitted by Delaware North, without similar conditions, was considered the proposal more in the interests of the NPS. Delaware North was, therefore, selected as the future concessioner.

■ As it did respecting the arguments raised on the $12 million equity capitalization and environmental liability, plaintiff once again urges the court to find defendant's procurement process flawed because, according to plaintiff, plaintiff was found "unsuccessful" on Criterion 16 due to the plaintiff's insistence that changes in the CSP and Housing Plan must lead to reconsideration of plaintiff's CIF contribution, and thus was found non-responsive and eliminated from further consideration. As discussed above, however, YRTSC's proposal was evaluated by the evaluation panel and continued to be under consideration by the selection panel and the selection official. The facts simply do not demonstrate that plaintiff YRTSC was precluded from consideration after the evaluation panel reviewed its CIF proposal.

■ Plaintiff also disputes defendant's contention that, "[i]n materials distributed to potential applicants, including YRTSC, the NPS stated that the Park Service had no 'right' number in mind for the level of the concessioner's contribution to the CIF, but felt that it would be above 5 percent." The response of the NPS to a question at the conference for all prospective concession applicants held on July 28–30, 1992, reveals clearly the position of the Park Service on this issue:

Q The SOR indicates a minimum of 5% for the Capital Improvement Fund. What is the right number?

A Crabtree: There are many millions of dollars of capital improvements to fund. We have no 'right' number in mind, but we feel that it will be above 5%. In evaluating the offers we are trying to pick a relationship. We are not picking a banker. We want a good solid financial package coupled with a good solid company who wants to be here, who is interested in what we want to do, who wants to be partners and work with the park, to be part of the Park Service. We want all of that. We may trade a little money off for a better relationship.[29]

---

**28.** YRTSC correctly notes that it is undisputed that the SOR provided for a renegotiation of the CIF fee every four years:

> (f)(1) Within ONE HUNDRED AND TWENTY (120) calendar days after the end of the FOURTH (4), EIGHTH (8), and TWELFTH (12) years of this contract the amount of the FRANCHISE FEE (FEE) provided for in this section and/or the amount of the CAPITAL IMPROVEMENT FUND (FUND) contributions provided for in Section 10 will be opened for reconsideration. A specific pro-

posal shall be made by the Secretary in writing after the end of the applicable contract year.

However, plaintiff's requirement for renegotiation is not tied to the four-year cycle, nor is the four-year renegotiation cycle tied to any particular aspect of the proposed contract with NPS.

**29.** The Phase II SOR also contained the following language:

> APPLICANTS should feel free to structure this in a way appropriate to their needs while also

Plaintiff simply has failed to show the existence of a factual dispute regarding the NPS position on this issue. Thus, it is difficult for the court to understand why plaintiff's counsel listed defendant's proposed findings of uncontroverted facts 39 as one of those which should cause the court to reject defendant's motion for summary judgment.

Throughout the solicitation process, NPS indicated that it would select the best overall proposal received. With regard to the CIF contribution, included in Criteria 15 and 16, YRTSC was rated "unsuccessful." Moreover, Delaware North Corporation was chosen as the final selectee based on NPS's overall appraisal of the strength of its CIF proposal. As stated in the selection panel memo to selection official Cables:

> Its proposal to contribute a specific percentage of its gross receipts to the CIF, although not the highest of all the offers, is generally comparable and, significantly, is unconditional (contrary to other offers received). It is also supported by pro formas which indicate an excellent understanding of the business risks and opportunities involved. DNC is the only offeror to be rated satisfactory on all Selection Criteria.

The court finds that the plaintiff has failed to demonstrate that the actions taken by NPS were arbitrary or capricious. To the contrary, the court finds that the evaluation panel's review of the plaintiff's proposal with respect to the CIF contribution was appropriate and reasonable.

### SUBMISSION OF A COMPLETE APPLICATION

*Defendant's Proposed Findings of Uncontroverted Facts 18*

*Defendant's 18*—The SOR instructed Phase II applicants that their application

---

giving consideration to NPS goals for the CIF. While APPLICANTS are free to make whatever proposals they may feel appropriate, the Service, in its internal analysis, has deter-

and related materials should reflect the entire proposal being made. Although the NPS reserved the right to verify information and clarify points as it felt necessary, the Park Service emphasized that its intention was to select a concessioner from the proposals made, without further submittals or presentations.

■ It is undisputed that although NPS reserved the right to verify information and clarify points as it felt necessary, its stated intention, nevertheless, was to select a concessioner from the proposals made without further submittals or presentations. Thus, the application should reflect the entire proposal being submitted. The court, therefore, is somewhat baffled as to why plaintiff cites to defendant's proposed findings of uncontroverted facts 18 as presenting a material issue in dispute. The language of the SOR clearly speaks for itself:

> 3. The APPLICATION and related materials submitted should reflect the entire proposal being made. The Service may verify information and clarify points as it feels necessary. If supplemental material is desired, the NPS will offer that opportunity to all APPLICANTS.

This provision of the SOR may be interpreted as a matter of law. Moreover, as discussed above, modifications to the terms of the SOR were strongly discouraged. Plaintiff has failed even to identify which portion, some of which is even a quote of the Phase II SOR, of defendant's proposed findings of uncontroverted fact number 18 plaintiff disputes.

### The NPS Contact with Delaware North

■ A related issue, alluded to by plaintiff in Count VII of its complaint, and subsequently raised during the proceedings was whether or not the Park Service had a private, and allegedly improper, communication with Delaware North during the evaluation process. Plaintiff contends that NPS unfairly contacted Delaware North to inquire about its CIF contribution rate, and

---

mined that a CIF proposal of less than five percent (5%) is likely to be considered insufficient.

that by not providing YRTSC the same opportunity, NPS prejudiced YRTSC in its proposal.[30]

The contact at issue is a brief telephone call, which lasted less than one minute, made by Stephen Crabtree to a representative of Delaware North on about December 8, 1993. A first-hand, uncontroverted account of the communication with Delaware North appears in Stephen Crabtree's deposition testimony, which reads:

Q [By plaintiff's counsel] ... During the meeting of the evaluation panel, did you ever contact Delaware North on any matter?

A [By Crabtree] Yeah.

Q What did you contact them on?

A ... Delaware North said in their offer that their offer was 5 percent of gross receipts unless current assets and current liabilities were negative, or—let me phrase that properly. Unless current liabilities exceeded current assets at the time of the takeover ... If it did, they said their offer was 4.5[%] And the question for—the panel asked me, "Do they mean 4.5 or not?"

And I called Delaware North ... I read them the sentence that was involved, and I said "Which is it?"

*And they said it means just exactly what it says.* If its current assets are less than current liabilities, we are for 4.5[%]. If current assets are greater or equal to, we offer 5[%]. And I conveyed that message to the panel. [Emphasis added.]

Plaintiff relies on Internal Department of the Interior Guidance contained in NPS–48 to argue that this communication by Crabtree was improper.[31] NPS provides in pertinent part:

### F. CLARIFICATION OF PROPOSAL DETAILS

No attempt should be made to obtain additional information or clarification of details *until all proposals have been evaluated.* Missing or incomplete information may, depending on the nature of the omission, render the proposal nonresponsive. If one offeror is given the opportunity to submit additional information, all others should also be allowed to do so. All requests from offerors for additional information must be made in writing. All offerors must be provided with the same information. If one offeror is given an answer to a question all

---

**30.** *The pertinent section of Delaware North's application states:*

> The Company has projected contributions to a Capital Improvement Fund in the amount of 5% of gross receipts.
>
> \* \* \* \* \* \*
>
> As indicated in Note 4, DNC had assumed in the accompanying projections that the assets of YP & CC at the Merger Date will include a sufficient amount of cash to equate current assets to current liabilities. In the event that such cash is not available, the Company's contribution to the Capital Improvement Fund would be reduced to 4½% of annual gross receipts and the projected financial statements would be revised accordingly.

**31.** Oddly enough, plaintiff only indirectly refers to the CIF contribution percentages actually used by the NPS evaluators. In plaintiff's supplemental brief, plaintiff makes an unsupported allegation that the percentages used cast doubt on Mr. Crabtree's veracity.

> The difficulty with this description of the conversation is that following the contact, the evaluation panel didn't use the 4.5% figure consistent with the description of the conversation; it used the 5% figure. While using the 5.0% figure makes DNC's proposal look better and avoids the problem that the SOR specifically states that a 'CIF proposal of less than five percent (5%) *is likely* to be considered insufficient,.' it draws into question what was actually said in the conversation between Mr. Crabtree and DNC.

(Emphasis added.) Although in the Phase II SOR, the NPS in strong terms had targeted a 5% CIF contribution for all applicants, 5% was not listed as a minimum requirement as in the case of the $12 million equity for working capital. Plaintiff has failed to document that the proposal of Delaware North, despite its fluctuating CIF contribution percentage was not the best overall proposal as was concluded by the NPS. Moreover, a comparison of the Delaware North and YRTSC proposals also reveals that the proposed Delaware North CIF contribution is the more advantageous to the government because of the higher percentage contributions in the early years. (See p. 409, above.)

offers must be given that information.[32] [Emphasis added.]

Plaintiff reads this National Parks Service Guideline as prohibiting any contact by NPS regarding the proposals, including those for clarifications, without contact with all applicants. Plaintiff further contends that if NPS gives any one offeror the opportunity to submit additional information, NPS must then give all other offerors that opportunity. Defendant responds that NPS–48 ¶ F and the Phase II SOR require NPS to approach every offeror only if NPS sought to obtain additional information, not if NPS merely sought clarification of information already supplied. As support, defendant cites to the words of the Phase II SOR which read: "the National Park Service reserves the right to request *additional information and oral presentations* from all APPLICANTS...." (Emphasis added.) Defendant reads this section of the SOR as consistent with NPS–48 in that both require NPS make inquiry to all offerors only if "additional information" is solicited.

To determine the nature and appropriateness of the communication at issue, although not strictly applicable, the FAR at 48 C.F.R. § 15.601 (1991) offers some guidance.[33] This FAR section provides definitions of both a "clarification" and a "discussion" as follows:

> *Clarification,* as used in this subpart, means communication with an offeror for the sole purpose of eliminating minor irregularities, informalities, or apparent clerical mistakes in the proposal. It is achieved by explanation or substantiation, either in response to Government inquiry or as initiated by the offeror. Unlike discussion (see definition below), clarification does not give the offeror an opportunity to revise or modify its proposal, except to the extent that correc-

tion of apparent clerical mistakes results in a revision.

\* \* \* \* \* \*

> *Discussion,* as used in this subpart, means any oral or written communication between the Government and an offeror (other than communications conducted for the purpose of minor clarification), whether or not initiated by the Government, that (a) involves information essential for determining the acceptability of a proposal, or (b) provides the offeror an opportunity to revise or modify its proposal.

48 C.F.R. § 15.601 (1991). Moreover, both NPS–48 and the FAR draw either implicit or explicit distinctions between a "clarification" on one hand, and obtaining "additional information," or providing an offeror an opportunity to revise or modify its proposal, on the other.

In a standard procurement case, the court in *M.W. Kellogg Co./Siciliana Appalti Costruzioni S.p.A. v. United States,* gave some guidance regarding how to distinguish between clarification and discussion when it wrote: "The test for determining whether discussions have occurred is whether an offeror has been afforded the opportunity to revise or modify its proposal." 10 Cl.Ct. 17, 25 (1986) (citing 2 McBride & Wachtel, *Government Contracts* § 9.10[14] (1984)). The court also stated "[m]ere clarification does not require discourse with the other offerors." *Id.* Professors Nash & Cibinic have drawn a similar distinction:

> [t]he Government can receive clarifications from an offeror without being required to conduct discussions with all offerors in the competitive range.... It would appear to make no difference whether it was the Government or the offeror who initiated the communication. Discussions have been found where there was an inquiry as to the price effect of a

---

**32.** *See also* the NPS regulations governing concession contracts, which state:

(c) The Director may solicit from any applicant additional information, or written or verbal clarification of a proposal, and may extend the solicitation period in his discretion.

36 C.F.R. § 51.4(c) (1992).

**33.** As stated previously, although the FAR was found not applicable in the instant case, the language and experience represented by the FAR is helpful for reference purposes.

substitution in materials, a verbal acknowledgement of an amendment and the confirmation of price, transmission to the initial low offeror of a list of technical questions and a response thereto, and an invitation to add an option quantity to a proposal. [Citations omitted.]

John Cibinic, Jr. & Ralph C. Nash, Jr., *Formation of Government Contracts* 593–94 (1986). The court finds, after review of the instant record and the information provided at the oral argument, that, at most, the NPS communication with Delaware North constituted a clarification, which, in fact, produced no new information for the evaluators from Delaware North. Indeed, Delaware North representative responded: "it means just exactly what it says." Thus, Crabtree's, perhaps inadvisable contact wth Delaware North, did not trigger a requirement to contact all the applicants.

In the instant case, even when the facts are interpreted most favorably to the plaintiff, the court finds that the Crabtree communication with Delaware North is harmless error. Assuming, for argument's sake only, that Stephen Crabtree's call to the Delaware North representative should not have been made, it, nevertheless, appears clear that when the Delaware North representative responded that "it means just exactly what it says," no additional information was provided to the evaluators and no harmful error was introduced into the evaluation procedure. Moreover, the phone call to Delaware North was not harmful to the application of plaintiff, YRTSC, and no harmful error was introducted into the evaluation procedure. The Court of Appeals for the Federal Circuit has stated:

In *Handy v. U.S. Postal Service*, 754 F.2d 335 (Fed.Cir.1985), this court held that the denial of a procedural right at the agency level, even one that was statutory, was to be reviewed under the harmful error standard. *Id.* at 338.

*Harp v. Department of the Army*, 791 F.2d 161, 163 (Fed.Cir.1986). This court has also held:

It is now well settled law in the Federal Circuit that 'denial of a procedural right at the agency level, even one that [is] statutory, [is] to be reviewed under the harmful error standard.' *Harp v. Dept. of Army*, 791 F.2d 161, 163 (Fed. Cir.1986), citing *Handy v. U.S. Postal Service*, 754 F.2d 335 (Fed.Cir.1985); *Olympia USA, Inc. v. United States*, 6 Cl.Ct. 550 (1984).

This quote was also echoed in *Sterlingwear of Boston, Inc. v. United States*, 11 Cl.Ct. 879, 889 (1987).

Previously, the United States Court of Claims had cited to *Hart v. United States*, 204 Ct.Cl. 925, 498 F.2d 1405, for the proposition that "a plaintiff is required to show 'demonstrable prejudice' to support a charge of procedural error." *Gratehouse v. United States*, 206 Ct.Cl. 288, 300, 512 F.2d 1104, 1111 (1975). The *Gratehouse* court went on to say: "We would only add that any other rule would put a premium on form rather than substance and permit a plaintiff to recover for technical rule infractions without demonstrated prejudice flowing therefrom. We decline to recognize such a result as in the interests of proper administration justice." *Id.* See also *Langingham v. United States*, 2 Cl. Ct. 535, 556 (1983).

The facts surrounding the communication are undisputed. Crabtree contacted Delaware North in order to clarify which of the two figures included in the Delaware North application in its description of the CIF contribution should apply. In turn, Delaware North represented that their proposal "meant what it said." By its response, Delaware North did not do anything to compromise the solicitation process. NPS did not solicit additional information or allow Delaware North, in any way, to amend its proposal. YRTSC, therefore, was not prejudiced by the contact, regardless of the interpretation of NPS–48, the SOR or 41 C.F.R. § 15.610(b). The contact was at the most harmless error on defendant's part. Given the facts of the instant case, NPS is certainly not required to resolicit this proposal due to the call

made by Stephen Crabtree to the Delaware North representative.[34]

### Obligation to Accept the Merger Agreement at a Set Price

■ In addition to those items identified by plaintiff's counsel as material facts in dispute at the oral argument on March 5, 1993, the court feels it also should address briefly an issue raised in Count V of plaintiff's complaint filed with this court. Plaintiff alleges, in Count V of its second amended complaint that the required purchase of YP & C Co. at a set price violated NPS regulation and, therefore, prejudiced plaintiff by "preventing plaintiff from having an opportunity to have its offer fully and fairly considered and compete fully and fairly for the contract." Plaintiff also alleges that "NPS's actions constitute a breach of the duty to treat and consider all bids fully and fairly." Strangely enough, however, after raising the issue in the complaint, plaintiff seems to abandon the point and does not address it later in the proceedings, despite the fact that plaintiff filed a motion for summary judgment and indicated to the court that the record was essentially complete. In *Singer Co. v. United States*, the Court of Claims previously wrote:

> This claim was called out in plaintiff's petition but the briefs which plaintiff submitted offer no discussion of this claim. We assume, therefore, that the claim has been abandoned.

*Singer Co. v. United States*, 215 Ct.Cl. 281, 321, 568 F.2d 695, 718 (1977).

The pertinent section of the Phase I SOR to which plaintiff is referring reads:

### Purchase of Existing Assets and Business

The current Concessioner, Yosemite Park and Curry Co. (YP & C Co.), operates pursuant to a contract which expires on September 30, 1993. YP & C Co. is a wholly owned subsidiary of MCA, Inc. The National Park Foundation (NPF) has entered into a Purchase Agreement with MCA, Inc., to purchase 100% of the stock of YP & C Co. on September 29, 1993. NPF, however, intends to assign the Purchase Agreement to the applicant selected by the NPS to be awarded the New Concession Contract. As a condition of the award of the New Concession Contract, the Concessioner selected must accept such assignment and carry out the terms and conditions of the Purchase Agreement. The selected applicant will accept the assignment of the Purchase Agreement at the time of the final execution of the New Concession Contract, and, on September 29, 1993, the Concessioner will purchase the stock of YP & C Co.

Generally under the Purchase Agreement, the Concessioner is to pay MCA, Inc., approximately $61.5 million for YP & C Co.'s stock either at the closing in cash or through the execution of a note in this amount.

Plaintiff points to NPS–48 in support of the notion that setting the price for YP & C Co. was contrary to Park Service regulation. The pertinent section of NPS–48 is chapter 8, ¶ J, which reads:

### J. PROSPECTUS WHERE EXISTING CONCESSIONER REQUESTS NPS TO SEEK A BUYER

In some situations the present operator may want to discontinue operating or sell his interest to another party but cannot find an interested operator. If the concessioner asks the NPS to locate an interested party to take over the operation, the NPS could assist by issuing a prospectus for the operation. However, the present operator would have to put in writing the fact that he/she is relinquishing his/her preference in renewal, that he/she will negotiate with the offeror

---

**34.** The court also finds it curious that with respect to defendant's proposed finding of fact 114, discussed more fully above, on the subject of raising the minimum amount of $12 million in equity for working capital, plaintiff argues, "Any doubts about the availability of working capital could have been resolved through a request for clarification." Yet, regarding the non-informative and apparently inconsequential, phone call made by Stephen Crabtree, the plaintiff would have the court find the whole solicitation flawed. The court is disturbed by plaintiff's lack of consistent positions.

that NPS selects and, if necessary, will submit to arbitration for the purchase price of his/her possessory interest as spelled out in the arbitration process. In this situation, the NPS must take the lead and supply all financial information and operating information to all offerors instead of relying on the present concessioner to provide this information to interested parties. The concessioner would have to agree to allow NPS to release certain financial information that would not injure the sales negotiation but would be beneficial to all offerors in submitting proposals. The concessioner would be required to give the same information to all interested parties or not give out the information at all. In other words, the solicitation should be treated fully as a prospectus and in no way looked upon as a fact sheet. The exception will be that sales price will be negotiated between the best offeror and the present concessioner (or arbitration) and some financial information may not be released during the solicitation. All offerors should receive the same information from the NPS and should not be put in the position of having to obtain it from the present concessioner.

Plaintiff is correct that NPS–48 seems to contemplate price negotiation between the existing concessioner and any offerors on the NPS prospectus. Nevertheless, the court finds that the actions of NPS in requiring the purchase of YP & C Co. at a set price did not prejudice plaintiff or prevent plaintiff from being fully and fairly considered in exactly the same way as all the other applicants. First, it is not clear from the evidence that the purchase price (established by NPS and YP & C Co.) was necessarily higher than that which plaintiff could have negotiated. Plaintiff has offered no evidence displaying the required price as inflated or that plaintiff could have negotiated a better deal. Plaintiff simply relies on its own statement that, "[t]his procedure produced a purchase price greater than that which would have been negotiated utilizing NPS–48 procedures...." Second, the Phase II SOR called for a package offer from applicants which took into ac-

count all factors, only one of which was the purchase of YP & C Co. at the price set. If YRTSC believed that YP & C Co. was overvalued by NPS, plaintiff could have compensated for that alleged "overpayment" elsewhere in its offer, or refused to offer at all. Moreover, it appears from plaintiff's proposal that plaintiff felt no hesitancy to condition its offer under the SOR with respect to environmental liability and its CIF proposal. Yet, it offered no qualification regarding the terms of the merger agreement and the fixed price of the YP & C Co. takeover. Finally, plaintiff is not prejudiced because the terms of the merger agreement were the same for all offerors. Every prospective concessioner was required to structure its proposal taking into account the purchase price of YP & C Co. Plaintiff's contention, therefore, that it was prejudiced by this requirement is without merit. Further, after reviewing the solicitation and evaluation process, the court finds that the NPS acted properly and did consider all bids fully and fairly.

## CONCLUSION

Given the magnitude, scope, and importance of the National Park Service's Yosemite concession contract, this court has engaged in a comprehensive and exhaustive review of the facts in this case in order to give plaintiff, and other disappointed bidders, the benefit of an independent assessment of the propriety of the government's actions. After full consideration of the pleadings, testimony, and filings in the above-captioned case, the court finds that plaintiff has failed to demonstrate a genuine issue of material fact in dispute to preclude summary judgment in favor of the defendant. Moreover, the court finds that the NPS behaved properly during the evaluation and selection process and that its actions do not even remotely approach the "arbitrary and capricious" standard of *Keco II*, needed to overturn an agency's procurement decision. The actions of NPS evaluators and decisionmakers were well thought out and carefully documented. The memorandum sent by the selection panel from John Davis to Herbert Cables,

418

the selection official, cited four key reasons for not recommending YRTSC: 1) YRTSC's offer did not contain copies of purchase pledges for the $7 million it had raised nor did it present any evidence that YRTSC had the ability to raise the balance of the $12 million; 2) a substantial portion of YRTSC's proposed CIF contribution was conditioned on a sharing of profits in later years of the contract, an eventuality which was not assured; 3) YRTSC limited its environmental liability to $12.3 million; 4) YRTSC assumed that implementation actions under the Concession Services Plan or Housing Plan would be subject to negotiation with the Park Service.

Based on the submissions received, the government's evaluation conclusions appear reasonable and well founded. In comparison to the proposal submitted by Delaware North, it is evident from the record that YRTSC was not entitled to be selected to receive the contract. The selection of Delaware North as the best overall offeror, and consequently as recipient of the concessions contract, is supportable as a valid and fair solicitation under the terms of the SOR and the applicable selection procedures. In accordance with the terms of the Phase II SOR, the proposal of Delaware North was considered by the NPS to the "best overall offer as it is most likely to achieve the objectives of the NPS for concession services and facilities in Yosemite National Park." Moreover, plaintiff has failed, despite the lengthy record, to demonstrate that the selection of Delaware North was improper.

For the reasons discussed above, the defendant's motion for summary judgment is GRANTED, and, therefore, plaintiff's cross-motion for summary judgment is DENIED. Additionally, plaintiff's request for injunctive relief is DENIED. The Clerk of the United States Court of Federal Claims is directed to enter judgment in favor of the defendant with costs to be borne by each party.

**IT IS SO ORDERED.**